**POWERCORP ALASKA, LLC, Appellant,**

v.

**STATE of Alaska, ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, ALASKA ENERGY AUTHORITY, Appellee.**

No. S–12176.

Supreme Court of Alaska.

Nov. 9, 2007.

---

Thomas R. Wickwire, Fairbanks, for Appellant.

Michael G. Mitchell and Rachel L. Witty, Assistant Attorneys General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

This appeal arises from a 2004 invitation to bid issued by the Alaska Energy Authority for switchgear systems to be installed in eight remote Alaskan villages. Appellant Powercorp Alaska, LLC alleges that the agency unduly restricted competition in the bidding process by requiring bidders to use a particular operating system that Powercorp does not use. At issue is whether the agency violated its authority in issuing a specification that excluded Powercorp from competing for the contract. We affirm the agency's determination that no violation occurred.

## II. FACTS AND PROCEEDINGS

### A. Facts

Hundreds of Alaskan villages are located off the electrical grid system and must rely on locally owned and operated power generation and distribution operations to meet their energy needs. Larger villages are served by well-established energy cooperatives, but roughly 120 of the smaller and less organized communities are not. The Alaska Energy Authority ("Energy Authority" or "agency") is a public corporation of the State of Alaska that provides technical and administrative support to the energy operations in these smaller communities. In recent years, the Energy Authority has implemented a Rural Power System Upgrade (RPSU) program to achieve a reliable, sustainable rural electrical

system in the face of decreasing federal funding. One aspiration of this program is to upgrade the utilities in these villages with automatic paralleling switchgear, which maximizes fuel-efficient power generation by "match[ing] power generation with demand on a continuous, automatic basis." [1]

A key component of the switchgear system is the master (or supervisory) control—the "brain" that collects data from remote sensors and turns generators on or off as necessary based on preset parameters. The industry standard for this device in the United States is a programmable logic controller (PLC).[2] The Energy Authority has extensive experience with PLCs and finds them to be "reliable." In particular, the Energy Authority regards Allen–Bradley brand PLCs to be "widely distributed, commonly available from multiple distributors, frequently installed, and familiar to experienced operators." [3] Powercorp, an Alaska subsidiary of an Australian company, manufactures an alternative to the PLC that runs off a personal computer (PC). The PC-based system reputedly "provides additional programming flexibility and adaptability, ... the ability to incorporate multiple power generation sources ... [and] a greater degree of remote control than is possible with a PLC system," but the Energy Authority has very little experience with this relatively new system.[4]

In 2003 the Denali Commission (a federal-state partnership that supports infrastructure development in rural Alaskan communities) awarded two grants to the Energy Authority for demonstration projects that would allow the agency to design, install, and evaluate different switchgear systems and ultimately to "determine which one best meets the community's needs." [5] After obtaining the necessary competitive-bid waiver, the Energy Authority awarded sole-source contracts to both Controlled Power, Inc., and Powercorp to install systems in Stevens Village and Golovin, respectively. While Controlled Power intended to install PLC switchgear, Powercorp would showcase its PC-based system, which would be the first of its kind in the United States.

On May 28, 2004—before it had completed its evaluation of the relative merits of the PLC and PC-based systems at the demonstration sites—the Energy Authority invited bids for a contract to install automatic switchgear systems in eight other villages. The invitation to bid (ITB) specified that the "Programmable Logic Controller" of the switchgear system was to be "Allen–Bradley. No Substitutes." Powercorp, which uses PC-based systems exclusively, did not bid. Two companies submitted bids; the contract was awarded to Controlled Power.

### B. Proceedings

Powercorp filed a timely protest of the ITB, asserting that the specifications "excluded it from bidding." Powercorp urged the agency to postpone the ITB until an objective evaluation of its PC system could be completed and also to review the bid specifications for "any unnecessary exclusions." The protest was denied, and Powercorp appealed to the executive director of the Energy Authority, who delegated the matter to an independent hearing officer.

In the proceedings before the hearing officer, Powercorp asserted that "the specifications were written to favor Controlled Power as the only company able to submit a responsive bid." More specifically, the hearing officer viewed Powercorp as alleging that (1) the Energy Authority abused its discretion in issuing the ITB before completing an evaluation of alternative switchgear systems; (2) Controlled Power had an undue influence in the preparation of design specifications; (3) the ITB omitted information necessary for prospective bidders to design a competitive system; and (4) the specification of an Allen–Bradley supervisory controller was unduly

---

1. *In re Powercorp Alaska, LLC*, Recommended Decision of Hearing Officer Andrew M. Hemenway, Appendix A at 4 (September 13, 2004).

2. App. A at 5.

3. *Id.*

4. App. A at 6.

5. App. A at 7.

restrictive.[6]

After conducting an extensive hearing, the hearing officer issued a recommended decision concluding that the Energy Authority acted within its discretion in all relevant respects. The hearing officer found that, because the Energy Authority "had no experience with either PC-based systems in general or the Powercorp system in particular," the agency had "reasonable grounds for not accepting a PC-based alternative at this time."[7] The hearing officer further found that pre-existing construction schedules dictated the timing of the ITB and that the Energy Authority did not abuse its discretion by issuing the ITB before completing its evaluation of the PC system. Finding no evidence that Controlled Power had exerted any influence on the agency's choice to require bids proposing PLC systems, the hearing officer also concluded that it was appropriate for the agency to ask Controlled Power for technical information concerning the system it built for its demonstration project so that this information could be used to develop the new bid specifications.[8] Last, the hearing officer declined to address whether the brand-name specification was unduly restrictive, concluding that, because Powercorp had no intention of submitting a bid for a PLC system, "the brand name specification was, from Powercorp's perspective, immaterial."[9]

The Energy Authority's executive director adopted the hearing officer's recommended decision as the agency's final administrative decision of the protest. Powercorp appealed to the superior court, which affirmed the agency's decision.

Powercorp appeals.

## III. DISCUSSION

### A. Standard of Review

■ When the superior court acts as an intermediate court of appeal in an administrative matter, we independently review the merits of the agency's decision.[10] We apply various standards in reviewing administrative determinations. When an agency interprets and applies its own regulations, we review its determination to ensure it is not arbitrary, unreasonable, or an abuse of discretion.[11] We review an agency's factual findings under the substantial evidence standard, reversing the decision only if we "cannot conscientiously find that the evidence supporting [the agency's decision] is substantial."[12] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[13]

■ We substitute our judgment for the agency's in deciding legal matters that do not involve agency expertise or matters in which "the agency's specialized knowledge and experience would not be particularly probative" in determining the meaning of the law at issue.[14] But when questions of law "implicate specialized agency expertise or the determination of fundamental policies within the scope of the agency's statutory function," we apply the rational basis standard.[15] Under this standard, we defer to the agency's determination so long as it is reasonable, regardless of whether we actually agree with it.[16]

6. App. A at 2.

7. App. A at 10–11.

8. App. A at 12.

9. App. A at 14.

10. *Williams v. Abood,* 53 P.3d 134, 139 (Alaska 2002).

11. *J.L. Hodges v. Alaska Constructors, Inc.,* 957 P.2d 957, 960 (Alaska 1998) (citing *Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 161 (Alaska 1982)).

12. *Robinson v. Municipality of Anchorage,* 69 P.3d 489, 493 (Alaska 2003) (citation omitted); *see also Williams,* 53 P.3d at 139 (citation omitted).

13. *Leigh v. Seekins Ford,* 136 P.3d 214, 216 (Alaska 2006) (citation omitted).

14. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987).

15. *Id.*

16. *Id.*

■ In cases involving specialized expertise, we have applied the rational basis standard to review agency decisions in the public procurement process.[17] Here, the Energy Authority is uniquely suited to understand how best to meet its objective needs. The question at issue, essentially, is whether the specification of a PLC "unduly restrict[ed] competition."[18] The agency's expertise with respect to the relative merits of a PLC over alternative systems would be of material assistance to any determination of this issue.[19] Further, the Energy Authority's broad statutory mandate calls upon it to exercise a significant range of discretion;[20] and nothing in the applicable procurement regulations purports to fence this discretion.[21] It follows that broad deference to the agency's judgment under the rational basis standard is appropriate in this case.

## B. Issues Addressed in the Administrative Hearing

Most of the points that Powercorp raises here simply renew, albeit sometimes recast in different phrasing or form, its original challenges on the various issues it argued in the administrative hearing.[22] Specifically, Powercorp questions (1) whether the Energy Authority had "sufficient basis for choosing a product-based specification instead of a needs-based one"; (2) whether the Energy Authority showed "illegal favoritism" to Controlled Power (the winning bidder) by "working with it to design its system then specifying it in the ITB"; and (3) whether Powercorp has standing to "challenge a bid specification as unduly restrictive."[23]

As already noted above, the hearing officer concluded that the Energy Authority acted within the scope of its legal authority in excluding PC-based systems from the ITB and that Powercorp failed to show that the agency acted unreasonably in interpreting and applying relevant statutes, abused its discretion in applying its own procurement regulations, or lacked a rational basis for preferring the PLC system. Powercorp continues to challenge the agency's judgment as to the relative merits of the PLC and PC systems, and it also argues that the agency has been inconsistent in justifying its preference.

As the hearing officer's decision recognized, under the rational basis test these arguments largely miss the point: the ques-

17. See, e.g., Laborers Local No. 942 v. Lampkin, 956 P.2d 422, 432 n. 11 (Alaska 1998) (reasonable basis standard applies in review of agency's application of its own procurement code); see also Gunderson v. Univ. of Alaska Fairbanks, 922 P.2d 229, 233 (Alaska 1996) (reasonable basis standard applies in review of agency's compliance with state procurement codes); Alaska Int'l Constr., Inc. v. Earth Movers of Fairbanks, Inc., 697 P.2d 626, 628–29 (Alaska 1985) (reasonable basis standard applies where agency's "determination clearly required an understanding of the type of business involved"); Chris Berg, Inc. v. State, Dep't of Transp. & Pub. Facilities, 680 P.2d 93, 94 (Alaska 1984) (abuse of discretion standard applies in review of agency's rejection of bid); State, Dep't of Admin. v. Bowers Office Prods., Inc., 621 P.2d 11, 13 (Alaska 1980) (reasonable basis standard applies to review of agency's determination that bid was unresponsive).

18. 15 C.F.R. § 24.36(c)(3)(i) (2006).

19. Kelly v. Zamarello, 486 P.2d 906, 916–17 (Alaska 1971) ("[D]eference should be given to the administrative interpretation, since the expertise of the agency would be of material assistance to the court.").

20. See generally AS 44.83.070 ("The purpose of the authority is to promote, develop, and advance the general prosperity and economic welfare of the people of the state by providing a means of financing and operating power projects and facilities that recover and use waste energy and by carrying out the powers and duties assigned to it under AS 42.45."); AS 42.45.

21. 15 C.F.R. § 24.36 (2006); Alaska Energy Authority, Rural Energy Group Procurement Procedures. Note that procurements by the Energy Authority as agent for the grantee of federal funds are exempt from state procurement statutes. See AS 36.30.850.

22. For example Powercorp argues in its brief that the agency's preference of a PLC rather than a PC-based system was "arbitrary" in violation of 15 C.F.R. § 24.36(c)(1)(vii) (2006). This argument merely reframes an issue that was fully addressed in the hearing officer's decision, namely whether the agency had the authority to limit bids to PLC systems. See App. A at 10.

23. Powercorp also raises nine issues of "superior court error." Because, as mentioned above, we directly review the agency's findings of fact and conclusions of law, claims that the superior court erred are not germane here.

tion at issue here is not whether the agency made the right decision in preferring one operating system over the other or in deciding to buy now rather than later; instead, the question is whether the agency had authority to specify the system it wanted and, if so, whether it had a rational basis for its ultimate choice. The hearing officer answered yes to these basic questions, and— after a careful review of the law and evidence bearing on the specific claims Powercorp advanced to support its challenge—issued a thorough, well-supported, and clearly explained decision rejecting Powercorp's challenge. The Energy Authority has adopted the recommended decision and, on appeal, Powercorp has failed to make a persuasive showing of any significant legal or factual error in the agency's decision. Accordingly, we affirm the hearing officer's recommended decision, set out its full text in Appendix A, and rely on it to explain our reasons for rejecting the points Powercorp raises here renewing its arguments before the agency.

### C. Additional Issues

Not all of Powercorp's arguments raise issues addressed in the hearing officer's decision. Powercorp lists several new points in this appeal; most need not be addressed on their merits because they were not properly preserved below or because, despite being listed, they have not actually been argued in Powercorp's briefing.[24] Two points, however, deserve brief attention.

■ Powercorp asserts that federal procurement cases govern the hearing process involved in this case; relying on this assertion, it suggests that a different burden of proof should have applied at the hearing below because, "in the [f]ederal procurement system[,] . . . the burden is first on the pro-

curing agency to justify the restriction," not on the protester to refute "all possible justifications" ex-ante. But Powercorp failed to raise the issue of applicable law (and corresponding burden of proof) in the proceedings below. In fact, the hearing officer's choice of the governing issues of burden of proof appears to have been adopted below at Powercorp's suggestion. Given these circumstances, Powercorp has waived the right to raise this argument here.[25]

■ Powercorp also challenges the hearing officer's ruling that it lacked standing to challenge the ITB's specification of an Allen–Bradley brand supervisory controller. It suggests that we should apply de novo review in resolving this issue. But even applying this proposed standard, Powercorp's argument on standing would be unavailing. As Powercorp itself acknowledges, it would have standing to challenge the brand-name specification only if it could establish that it would have bid "but for the specifications being so narrowly drawn as to exclude its product." It is uncontested that the specification of the Allen–Bradley brand was not what "excluded" Powercorp from bidding in response to the ITB; rather, the obstacle was the more general specification of a PLC system. Because the hearing officer correctly recognized that the brand-name specification was immaterial to Powercorp based on undisputed facts, we uphold the agency's ruling on this point.[26]

## IV. CONCLUSION

Because the Energy Authority's decision to deny Powercorp's bid protest has a reasonable basis in law and is supported by substantial evidence, we AFFIRM the agency's decision in all respects.

24. For example Powercorp lists as an issue that the agency's hearing deprived it of due process. The issue has not been adequately briefed.

25. *See Nenana City Sch. Dist. v. Coghill*, 898 P.2d 929, 934 (Alaska 1995) (issues not briefed or raised in administrative appeal to superior court are waived). We need not address whether an argument that has been waived has merit. But it is worth noting that Powercorp itself suggests that the proposed standard applies only where "single-source procurement" is at issue. Be-

cause we affirm the agency's conclusion that the ITB at issue was competitive and not a de facto sole-source contract, Powercorp's reliance on this proposed standard would seemingly fail to advance its claim even if Powercorp had not waived the issue.

26. *See Hoblit v. Comm'r of Natural Res.*, 678 P.2d 1337, 1340 (Alaska 1984) (party has standing only where he has "sufficient personal stake in the outcome of the controversy").

## APPENDIX A*

### BEFORE THE ALASKA ENERGY AUTHORITY

In the Matter of:

POWERCORP ALASKA, LLC,

Appellant.

### AEA ITB No. REG–04–230
### RECOMMENDED DECISION

This is a protest appeal. It concerns Invitation to Bid [ITB] REG–04–230, issued on May 28, 2004 by the Alaska Energy Authority [AEA] for the purchase and installation of paralleling switchgear at multiple sites. Under the amended ITB, bids were due on June 30, 2004. Prior to the bid due date, Powercorp Alaska, LLC [Powercorp] filed a protest. AEA issued a decision denying the protest on June 25, and Powercorp filed an appeal with AEA's executive director.

Two bids were submitted, by Controlled Power, LLC [Controlled Power] and by Thompson Technologies. The bids were opened on July 23. Following review of the bids, the bid submitted by Thompson Technologies was deemed non-responsive and was rejected. The bid submitted by Controlled Power was accepted. Controlled Power is the prospective contractor, pending resolution of the protest appeal.

The executive director delegated the conduct of the hearing on Powercorp's protest appeal to a hearing officer, retaining authority to make a final decision upon the recommendation of the hearing officer. The hearing officer conducted a hearing in Anchorage on August 31–September 1. Assistant Attorney General Mike Mitchell represented AEA, and attorney Thomas Wickwire represented Powercorp. Representatives of Controlled Power were contacted by telephone following initial testimony, and they listened in from Seattle. Sworn testimony was provided by Dennis Meiners, Harvey Paul, Russ Cahill, Chris Mello, Kris Noonan, John Cameron, Ted Creedon, Brian Gray and Mary Judd.

This recommended decision is based on the record, which consists of the agency file as provided to the hearing officer and the parties, the exhibits submitted at the hearing, and the testimony of the witnesses at the hearing.

### Issues for Decision

1. Did AEA abuse its discretion in issuing the ITB prior to completing an evaluation of alternative switchgear systems?

2. Did Controlled Power have undue influence in the preparation of design specifications?

3. Did the ITB omit necessary information?

4. Was the specification of an Allen–Bradley supervisory controller unduly restrictive?

### Applicable Law

This solicitation is exempt from the Procurement Code, AS 36.30. Pursuant to the master grant agreement between AEA and the Denali Commission, it is subject to 15 CFR 24.36, which mandates full and open competition, and to AEA's procurement policies. 15 CFR 24.36(c)(1)(vi) indicates that brand name specifications restrict competition. Unduly restrictive specifications are improper in the public procurement process. AEA's procurement policy states that "a specification that limits the procurement of items to a specific manufacturer's name or catalog number shall only be used for equipment ... specifically identified by a consulting engineer and included in a stamped set of design drawings." [AEA Procurement Policy, Exception # 4]

The protestor bears the burden of proof as to all factual matters. The executive director determines facts *de novo* following a hearing and exercises independent judgment on questions of law and agency policy. The executive director should afford due deference to a decision by agency staff regarding a matter within the discretion of the individual making the determination.

* The AEA's decision has been edited to conform with our technical rules.

## Factual Findings

Approximately 171 remote rural Alaskan villages are located off the electrical grid system and receive their electrical power from one or more local power plants. In 51 villages, the electrical utility is operated by the Alaska Village Electrical Cooperative [AVEC]. In the remaining 120 villages, typically smaller and more remote, the electrical utility is operated by a locally owned electrical utility company. Historically, the locally owned and operated utilities have operated at a cost that cannot be supported by local users, and have provided unsatisfactory levels of reliability. For at least fifteen years, AEA has been a major provider of technical and managerial expertise and a major funding agency for the locally owned and operated rural electrical utilities. One component of AEA's services has been a circuit rider program, in which AEA personnel or consultants travel to villages and provide advice and technical assistance on site.

In recent years, with significant decreases in state funding of energy programs and with increased federal funding through the Denali Commission that is perceived as unlikely to be maintained in the long term, policymakers have increasingly focused on achieving a reliable, sustainable rural electrical system statewide. AEA's Rural Power System Upgrade [RPSU] program was implemented to work towards sustainability by upgrading powerplants throughout rural Alaska. As part of that program, AEA developed a prioritized list of all 120 villages under its oversight and set out to overhaul as many as possible while Denali Commission funding was available, anticipating completion of all the villages within about ten years.

The RPSU program includes, among other things, exploring and expanding the use of alternative energy sources, primarily wind, at remote sites. It also includes increasing the efficiency of electrical generation at rural power plants by installation of automatic paralleling switchgear, which matches power generation with demand on a continuous, automatic basis. [Alaska Rural Energy Plan ("Plan"), § 1.1.1.2] Paralleling switchgear can

reduce fuel consumption by 5–10%, [*id.*, Table 1–1, note 8] but can cost $150–$200,000.

AEA is also interested in increasing its ability to remotely monitor powerplant operations, in part to make up for substantial reductions in funding for the circuit rider program in recent years. Beginning in mid-2002, AEA's RPSU program manager, Kris Noonan, and a project manager assigned to the RPSU program, Lenny Landis, had been looking into alternatives for remote monitoring. [LL email 7/3/03] By July 2003, their efforts had led them to Powercorp, which had installed a number of remote monitoring and control systems in Australia and elsewhere, including Antarctica. [*Id.*] In mid-2003, AEA received a remote monitoring proposal from Ernie Baumgartner, which also relied on the Powercorp system. [LL email 8/4 & 6/03] The Powercorp system had been used in a number of locations for hybrid diesel/alternative energy systems control, [*id.*] which was of interest to AEA because wind generation (and heat co-generation) are areas highlighted as potential contributors to sustainability in the Alaska Rural Energy Policy plan. [*Id.*; Plan at § 2, § 3]

The critical components in a paralleling switchgear system are a supervisory (or master) controller, one or more engine controllers, contactors, and the operator interface unit. The system includes sensors that detect load and demand as well as generator conditions (*e.g.*, temperature, speed). The supervisory controller takes the data sent to it by the sensors and based on pre-programmed parameters instructs the engine controllers to adjust the generators to the optimum operating speed. The contactors connect the engine controllers to the generators. The operator interface unit (a monitor screen and keyboard) allows an on site operator to monitor conditions and make adjustments.

Programmable logic controllers [PLC] are the industry standard for supervisory controllers. PLCs are manufactured by a number of manufacturers, including Allen–Bradley, General Electric, and others. A PLC uses ladder logic to derive commands for the engine controllers from the data submitted by the sensors. PLC-based systems utilizing

an Allen–Bradley supervisory controller had been supplied to AEA under term contracts for more than ten years. Allen–Bradley controllers are installed in thousands of locations, including many in Alaska, and are recognized in the industry as reliable. Within the electrical power generation industry, they are widely distributed, commonly available from multiple distributors, frequently installed, and familiar to experienced operators.

The Powercorp system supervisor controller relies on a personal computer [PC] rather than a PLC to derive the commands sent to the engine controllers. The Powercorp system is the only PC-based system currently being marketed in Alaska. Both PC- and PLC-based systems are programmed to derive and communicate commands based upon preset parameters. Both the PC and the PLC can be programmed to any number of different configurations deemed suitable by the operator. However, the PC-based controller provides additional programming flexibility and adaptability, such as the ability to incorporate multiple power generation sources. In addition, because it is computer based, remote monitoring (given an online connection) is built into the Powercorp system and the programming for the PC can be manipulated online in a manner that affords a greater degree of remote control than is possible with a PLC system.

In late July 2003, AEA arranged for Powercorp representatives to travel to Washington state to discuss with Controlled Power the possibility of working cooperatively to design a switchgear system using the Powercorp PC-based supervisory controller (marketed as the "Commander") in a demonstration project, and as a bidder on future RPSU projects. [LL email 8/4, 5 & 6/03] Those talks floundered, however, when Controlled Power and Powercorp were unable to come to an agreement over which of them would be the prime contractor in any such arrangement.

To assess which of various alternative switchgear systems might provide the most benefit, in late 2003 [KP email 8/5/03] the Denali Commission awarded grants for three demonstration projects to design, build and install fully automatic paralleling switchgear systems with remote data access capability in rural Alaska villages. Funds for one project were awarded to AVEC; AEA received funding for two projects.

By the fall of 2003, AEA was actively working on ten RPSU projects that had been approved for construction. AEA selected two of the projects for the demonstration grant funding, at Golovin and Stevens Village. Pursuant to the grant, AEA awarded sole source contracts for the Golovin (in December 2003) and Stevens Village (in January 2004) paralleling switchgear to Controlled Power and Powercorp, respectively. AEA was to monitor and evaluate all three systems "to determine which one best meets the community's needs." The Golovin equipment was scheduled for delivery under the contract by March 12, 2004. The Stevens Village equipment was scheduled for delivery under the contract by February 27, 2004.

The Stevens Village ITB called for remote monitoring functionality, which had not previously been required by AEA in its switchgear contracts. The ITB specified the same manufacturer for the supervisory controller (Allen–Bradley) and engine controllers (Woodward) as in prior AEA solicitations. However, it specified a different model for the engine controller, a Woodward GCP–31. The Woodward GCP–31 is a microprocessor-based unit that provides enhanced capability for remote monitoring as compared with prior Woodward units. In March 2004 AEA finalized detailed specifications for the Stevens Village and Golovin projects [1] and began work on the specifications for its next round of construction. [BG email 3/13]

On March 17, 2004, an AEA consulting engineer inspected the Powercorp gear at the fabrication site in Bothell, Washington. The consultant found the quality of the swit-

---

1. In March, Gray was working on detailed specifications for the remote monitoring and control functions at the Golovin project. [BG email 3/5/04] It is unclear why these specifications were still being prepared, since the due date for delivery was March 12.

chgear construction "good," and the quality of the workmanship "excellent" but observed that the system "did not adhere to the specifications for the Stevens Village system," noting that those specifications had been designed in many respects "to meet the unique needs of rural Alaska and to provide consistent equipment at multiple sites." The consultant recommended several minor alterations to the Powercorp system in any future AEA project, and also one significant alteration:

> The automatic control of the generators should be accomplished using the Allen Bradley PLC as utilized at other sites. Due to the unique operating environment of ... rural Alaska, there needs to be commonality between communities. This will allow the AEA to easily troubleshoot problems at communities, easily monitor the equipment, and provide programming revisions.

The Stevens Village switchgear installation was to be completed on or about April 9 [DM email 3/31/2004] and the Golovin switchgear was scheduled for late April. [*Id.*] AEA's consultants, in the meantime, continued to work on the specifications for the anticipated ITB for the next set of RPSU projects.

The consultant's recommendation regarding the desire for commonality of equipment was consistent with prior AEA comments that a standard control scheme, components and layout was desired in order to facilitate AEA's operator training, maintenance and trouble shooting, and parts replacement, as well as to enable continuing refinement and improvement of systems in the field. [LL email, 8/6/2003] AEA decided to base the new ITB specifications on the PLC-based system installed at Stevens Village, with key components (other than the Woodward GCP–31 engine controller) being current versions of the same equipment that had been installed under AEA paralleling switchgear contracts for at least ten years previously, under term contracts and prior competitive solicitations. The decision to require a PLC-based system was based on (1) Powercorp's lack of a prior operating and service record in Alaska; (2) the lack of multiple distributors for Power-

corp's supervisory controller; and (3) the desire to maintain commonality of key components.

AEA retained a consulting electrical engineer, Brian Gray, to prepare the specifications for the new ITB, instructing him to incorporate the PLC-based system used in the Stevens Village demonstration project as the prototype for the ITB. Work continued on the new specifications through April. [CV email 4/12 & 14/2004] The AEA consultants contacted Controlled Power with specific technical questions in order to draft specifications that would meet AEA's request to base the ITB on the system installed at Stevens Village. [JD email 4/15; BG email 4/21,22, & 30] By the end of April the ITB specifications were nearly complete. [BG email 4/30; CV email 5/3]

The specifications called for using an Allen–Bradley PLC controller. Powercorp could have responded, substituting an Allen–Bradley PLC controller for its own controller, but it chose not to because the PC-based Commander controller is the core product it sells and it is not interested in building systems using other controllers. The Powercorp PC-based system provides enhanced remote control capability over a PLC-based system, and is a better system for use in mixed-generation power facilities. The Powercorp system has an extensive track record in remote locations, often in severe environmental conditions, and has been used in Antarctica. Powercorp has employed the Woodward GCP–31 engine controller (under a prior owner's brand name) on many occasions.

Although the Denali Commission's grant was intended for the evaluation of alternative systems, AEA has not developed specific criteria for determining the relative merits of the systems installed under the three Denali Commission demonstration grants. One basis for evaluation of the systems installed will be performance reliability. A minimum evaluation period of 30 days would provide some useful information, but a comprehensive assessment of operating performance and reliability would require operation for one full year.

## Analysis

### A. *AEA Did Not Abuse Its Discretion by Issuing an ITB Prior to Evaluation.*

The central thrust of Powercorp's protest and appeal is that by issuing an ITB before completing an evaluation of competing systems, AEA has set itself on a course to make PLC-based systems the basis for all future procurements under the RPSU program. Powercorp contends that the agency's stated reasons for proceeding to bid prior to completing an evaluation of its PC-based system mask institutional resistance to innovation. Powercorp asserts that senior management should intervene to ensure that potential gains in functionality from a PC-based system that could lead to increased sustainability are not prematurely removed from consideration.[2]

Powercorp's primary argument is that, given AEA's stated preference for commonality, the selection of PLC-based equipment for this ITB will effectively mandate the specification of PLC-based systems in future solicitations. For that reason, Powercorp argues, and because a PC-based system provides enhanced functionality, the requirement for a PLC controller was unduly restrictive, and AEA should either have opened the ITB up to PC-based systems, or delayed issuing the ITB until after the demonstration project was completed. AEA responds that the issuance of the ITB was dictated by pre-existing construction schedules, and that it had reasonable grounds for not accepting a PC-based alternative at this time.

The evidence and testimony clearly establish that AEA was within its discretion in issuing the ITB before completion of the demonstration project and evaluation process, given the pre-existing construction schedule. Although AEA relied on commonality as a justification for its brand name specification, there are multiple PLC-based

systems and the decision to issue an ITB before the evaluation of Powercorp's PC-based system had been completed had nothing to do with a desire for commonality. It was driven, rather, by AEA's judgment that an operational evaluation of the Powercorp PC-based system was necessary, because it had no experience with either PC-based systems in general or the Powercorp system in particular.

Whether AEA actually needed to await the results of the demonstration project evaluation in order to determine whether the Powercorp system is sufficiently reliable for use in Alaska may reasonably be questioned. In light of Powercorp's experience as a remote site supplier, including the Australian bush, Southeast Asia, and Antarctica, AEA might have obtained sufficient assurances of reliability by other means than a demonstration project.[3] But the commonality justification for limiting competition to Allen–Bradley controllers will not be materially stronger in a future ITB, simply because eight more systems use that controller, and the decision to await the outcome of the Golovin demonstration project was not unreasonable. Powercorp's installed base of about 50 PC-based systems worldwide pales in comparison to the installed base of PLC-based systems. Specification of a PLC-based system did not unduly restrict competition, because there are multiple manufacturers and distributors of such systems, and it was not unreasonable to require an Alaskan operating record. Mr. Noonan testified that no decision has been made to preclude the use of PC-based systems in future solicitations, and that if the Powercorp system performs satisfactorily at Golovin the question of its use in future solicitations will be revisited. Similarly, to the extent that Powercorp asserts that a PC-based system provides enhanced functionality, completion of an evaluation would allow AEA to determine whether those features should be required in a future ITB.

---

2. This assertion should not be taken lightly. The ISER report on achieving sustainability, issued in 2003, specifically concluded that "Professional risk aversion on the part of designers and engineers can also retard or discourage innovation in design proposals." [ISER at 51]

3. This point, like Powercorp's contention regarding barriers to technical innovation, finds support in the ISER report, which acknowledges that sustainability can be adversely impacted by pressure at the local level to maintain local staff at unsustainable levels.

I conclude that AEA did not abuse its discretion in proceeding to the ITB stage on this contract before completing an evaluation, and that the specification of a PLC was not unduly restrictive.

### B. *Controlled Power Did Not Have Undue Influence.*

██ Powercorp argues that Controlled Power had undue and improper influence in the preparation of the design specifications. This argument is completely unpersuasive. Powercorp conflates AEA's decision to specify a PLC-based supervisory controller with AEA's subsequent actions to implement that decision. Clearly, once AEA had decided to use a PLC supervisory controller, it was entirely appropriate to contact Controlled Power to obtain technical information for incorporation into the bid specifications. There is no suggestion in the record that Controlled Power offered anything other than technical clarification in response to AEA's inquiries. There is no evidence that Controlled Power had any influence or role in AEA's decision to preclude PC-based systems from participation in the ITB.

### C. *The ITB Contained the Necessary Information.*

Powercorp argues that the ITB failed to provide information that bidders needed in order to prepare competitive bids, in that: (1) detailed specifications for the Stevens Village installation were not provided, which gave Controlled Power an unfair competitive advantage; and (2) the ITB indicated that undisclosed factors would be used to evaluate bids.

AEA responds that (1) the Stevens Village specifications were not necessary in order to prepare a competitive bid, and (2) bids were not evaluated on any factor but cost.

██ The record does not support the argument that the detailed specifications for Stevens Village were necessary in order for a

bidder to prepare a competitive proposal. Most significantly, Thompson Technologies submitted a lower bid than Controlled Power, even though it lacked those specifications. Representatives of Thompson Technologies and Bethel Services, Inc., a prospective bidder, testified that the information provided with the ITB was sufficient to prepare a competitive bid. Even if the information had been deficient, Powercorp would not have standing to object, because it had no intention of submitting a bid using a PLC, and the general rule is that only a prospective bidder has standing to protest the terms of a solicitation.

Similarly, Powercorp has not shown that any factors other than price were to be evaluated. Although the ITB includes language suggesting that the "most beneficial" bid would be selected, [ITB at 2, par. 7; Part 5, par. C] both the program manager and the procurement officer stated that price alone would be used to determine the award as among any responsive bidders. It appears that the "most beneficial" language was included by oversight, inasmuch as it is clearly improper to evaluate bids (except as to responsiveness) on any criterion other than price; for other factors to be considered, the RFP process must be utilized.[4]

### D. *Powercorp Lacks Standing to Contest Specification of the Allen–Bradley Controller.*

Powercorp argues that the specification of an Allen–Bradley supervisory controller was improper because: (1) it was a sole source solicitation; and (2) the specification is unduly restrictive because it establishes a brand requirement rather than a functional requirement.

AEA responds that (1) the ITB was not sole source, because multiple bidders could provide the switchgear system even with the specified controller; and (2) the brand specification was reasonable for reasons of demonstrated performance and commonality of equipment.

---

4. *See* AEA Procurement Procedures, Par. 5, Exception No. 1: "Standard procedures call for all procurements of $5,001 or more to be competitive, with the low bid deciding how a contract is awarded. A 'proposal' method may be used if AEA's project manager determines that factors other than cost are a significant consideration."

The ITB was not a sole source procurement: Allen–Bradley controllers are available from a multitude of distributors, and multiple firms design, fabricate and supply automatic paralleling switchgear systems. Two firms submitted bids, and more could have. The specifications did, however, call for a name brand component, and Powercorp asserts that specification was unduly restrictive and in violation of AEA's procurement procedures.

But the brand name specification was, from Powercorp's perspective, immaterial, because Powercorp had no intention of submitting a bid for any PLC-based system, regardless of the brand specified. For this reason, it is not necessary to determine whether the name brand specification was appropriate.

### Recommendation

AEA advanced three reasons for precluding Powercorp's PC-based system from participation in this ITB: (1) it has not been demonstrated to be reliable in Alaskan field operating conditions; (2) the supervisory controller in the Powercorp system is not a widely distributed, easily obtained component generally familiar to operators in the industry; and (3) AEA has a need for commonality of equipment.

I conclude that AEA had a reasonable basis for requiring completion of a demonstration project prior to incorporating new technology into the RPSU program. Because the timing of this ITB was driven by pre-existing construction schedules, that conclusion suffices to resolve this protest appeal.

Whether, after resolving any concerns regarding the reliability of the Powercorp system, either the relatively limited availability of the system or the lack of commonality with existing equipment would be grounds for precluding Powercorp from a future ITB is a question that should be resolved at a later date, in the context of a subsequent RFP.

I recommend that the protest appeal be denied.

DATED September 13, 2004.

Andrew M. Hemenway
Hearing Officer