**Glenn A. WILBER, Appellant,**

v.

**STATE of Alaska, COMMERCIAL FISHERIES ENTRY COMMISSION, Appellee.**

**No. S–12420.**

Supreme Court of Alaska.

June 27, 2008.

Michael A.D. Stanley, Juneau, for Appellant.

Thomas E. Lenhart, Assistant Attorney General, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Glenn Wilber challenges the Commercial Fisheries Entry Commission's (CFEC's) limited entry regulations for the Southeast Alaska Geoduck[1] Fishery. Wilber received a nontransferable permit for the fishery but he desires a transferable permit. Wilber maintains that CFEC regulations measuring past participation in the geoduck fishery, and par-

---

1. The Pacific geoduck clam (*Panopea abrupta*) is the largest intertidal clam in the world, weighing up to ten pounds, and reaching life spans of up to 163 years. *See* J.M. Lobo Orensanz, et al., *Precaution in the Harvest of Methuselah's Clams—the Difficulty of Getting Timely Feedback from Slow-paced Dynamics*, 61 CAN. J. FISH. AQUAT. SCI. 1355 (2004). Geoducks have slow growth rates, taking five to seven years to reach harvestable size. The ecology of the geoduck is only dimly understood, and sampling estimates tend to vary widely due to their broad geographic distribution and the difficulty in identifying subtidal geoduck habitats. *See* Christopher Siddon, *Evaluation of the Southeastern Alaska Geoduck (Panopea Abrupta) Stock Assessment Methodologies*, Alaska Department of Fish and Game, Special Publication No. 07–02, March 2007, *available at* http://www.sf.adfg.state.ak.us/FedAid PDFs/sp07–02.pdf.

ticularly the agency's combination of two seasons into one "year" for the purposes of assessing hardship, fall outside of the scope of the agency's authority under the Limited Entry Act's initial permit issue provisions. Because the CFEC regulations reasonably respond to the unusual circumstances of a mid-year moratorium on geoduck harvesting, and in light of the broad discretion afforded CFEC under the Limited Entry Act for determining hardship, we affirm the agency's decision to deny Wilber a transferable permit.

## II. FACTS AND PROCEEDINGS

Geoducks were first commercially harvested in Southeast Alaska in the early 1970s. The fishery remained small throughout the 1970s, but grew significantly throughout the 1980s, to the point that in 1990 participants petitioned the CFEC to limit entry into the fishery. CFEC denied this petition, and three others that followed in 1993, 1996, and 1998. Though it denied each petition, CFEC undertook an analysis of the fishery to determine whether entry should be limited.

Currently, the season for geoduck runs from October 1 to May 31. The Alaska Department of Fish and Game manages the fishery by opening different locations at different times throughout the season.

In 1996 the Alaska Legislature passed House Bill 547;[2] the bill imposed a four-year moratorium on entry into the geoduck and other Southeast Alaska dive fisheries.[3] The moratorium took effect July 1, 1996, and reached the expiration date set by the legislature on July 1, 2000.[4] The bill directed CFEC to study whether it was necessary to limit entry into the geoduck fishery under the Limited Entry Act (AS 16.43.010–16.43.990).[5] The bill largely prohibited new divers from entering the fishery and allowed

past participants to keep harvesting geoduck under an interim use permit system.[6] The bill also directed that participation during the moratorium could not be considered as evidence of past participation in any limited entry system following the moratorium.[7]

In 1998 and 1999 CFEC held a series of meetings in Southeast Alaska to solicit public comment about whether to limit entry into the geoduck fishery and possible ways to limit entry if necessary. In November 1999 CFEC adopted regulations for limiting entry into the geoduck fishery.[8] The regulations took effect on the last day of the moratorium, June 30, 2000.[9] The regulations established an eligibility period of January 1, 1992 to July 1, 1996. CFEC set the maximum number of permits for the geoduck fishery at 104.[10]

After limiting entry into the fishery, CFEC proposed regulations to establish a priority classification system for distributing the 104 permits in September 2000. The system awarded points based on the following scale:

| Year | Pounds / Year | Points |
|---|---|---|
| 1995 to | 400 pounds or more | 10 |
| July 1, 1996 | At least 100 pounds, but | |
| | less than 400 pounds | 7 |
| | Less than 100 pounds | 3 |
| 1994 | 800 pounds or more | 9 |
| | At least 400 pounds, but | |
| | less than 800 pounds | 6 |
| | Less than 400 pounds | 3 |
| 1993 | 2,700 pounds or more | 8 |
| | At least 1,200 pounds, but | |
| | less than 2,700 pounds | 5 |
| | Less than 1,200 pounds | 3 |
| 1992 | 5,200 pounds or more | 7 |
| | At least 2,200 pounds, but | |
| | less than 5,200 pounds | 5 |
| | Less than 2,200 pounds | 2 |

CFEC took public comment on the regulations from September through October. All divers with a history of participating in the fishery were given notice of the point system. CFEC received comments from approxi-

**2.** House Bill (H.B.) 547, 19th Leg., 2d Sess. (1996).

**3.** Ch. 125, § 2, SLA 1996.

**4.** *Id.* §§ 4–5.

**5.** *Id.* § 2.

**6.** *Id.*

**7.** *Id.*

**8.** 20 Alaska Administrative Code (AAC) 05.806–09 (1999).

**9.** *See id.;* ch. 125, § 4, SLA 1996.

**10.** 20 AAC 05.320(i).

mately forty divers, including Wilber. Neither Wilber nor any other diver objected to combining the 1995 and 1996 years' catch totals.

CFEC's point system awarded points for participation in the calendar years of 1992, 1993, 1994, and 1995 combined with the first half of 1996.[11] The system awarded more points for participation in recent years. CFEC's system awarded a maximum of twenty-four points.[12] CFEC's point system did not evaluate past participation and economic dependence separately as CFEC considered the factors to be "linked" in the geoduck fishery. CFEC reasoned that "[y]early harvest totals ... provide the best information regarding participation and economic dependence."

CFEC combined 1995 with the first half of 1996 because the majority of geoduck landed in 1996 were caught after the start of the moratorium [13] and thus could not be considered in CFEC's point system. Additionally, CFEC believed that the small number of geoduck caught in the beginning of 1996 made it more reasonable to combine that year with 1995. There was only a brief four-day opening of the fishery in January 1996 in Symonds Bay resulting in a harvest of 9,708 pounds of geoduck by nineteen divers. In comparison, 104 divers harvested approximately 250,000 pounds in 1995, and after the moratorium began, some 93 divers harvested over 190,000 pounds in the remainder of 1996.

CFEC adopted its proposed point system on November 7, 2000. It also promulgated regulations establishing "significant" and "minor" hardship levels as required by AS 16.43.250(b)-(c).[14] CFEC set the significant hardship level at nineteen to twenty-four points.[15] CFEC set the minor hardship level

at zero to ten points.[16] Applicants classified at the significant hardship level automatically received transferable permits while those below the minor hardship level threshold received nontransferable permits. Those applicants receiving between eleven and eighteen points were formally unclassified but nevertheless received transferable permits.

Wilber began harvesting geoduck in 1974. However, Wilber did not participate during the limited entry eligibility period until 1995. Wilber harvested 1,849 pounds during a January 1995 opening, 1,842 pounds during an October 1995 opening, and 1,433 pounds during a January 1996 opening. Wilber applied for a limited entry permit for the geoduck fishery in March 2001. Wilber claimed ten points, the maximum possible points given that he only participated in the fishery in 1995 and 1996 and prior to 1992. CFEC classified Wilber's application at ten points, leaving Wilber one point short of the regulatory threshold for receiving a transferable permit.

Wilber requested a hearing on his application on May 6, 2001. A CFEC hearing officer denied Wilber's request, concluding that it did not raise any issues requiring a hearing. The officer treated Wilber's request as a constitutional challenge to the geoduck limited entry regulations and issued a written decision finding the regulations constitutional. The officer affirmed CFEC's classification of ten points.

Wilber hired an attorney after his request for a hearing was denied, and he timely petitioned for administrative review of the hearing officer's decision. Wilber's petition sought the commissioners' review of the geoduck fishery limited entry regulations, arguing that 20 AAC 05.808 exceeded CFEC's statutory authority under AS

---

**11.** *See* 20 AAC 05.808.

**12.** 20 AAC 05.808(a). There are actually thirty-four possible points available, but CFEC's hardship scale will only award "a maximum of 24 points." *Id.*

**13.** *See* AS 16.43.228(g).

**14.** AS 16.43.250(b)-(c) provides:
    (b) The commission shall designate in the regulations those priority classifications of ap-

plicants who would suffer significant economic hardship by exclusion from the fishery.
    (c) The commission shall designate in the regulations those priority classifications of applicants who would suffer only minor economic hardship by exclusion from the fishery.

**15.** 20 AAC 05.809(a).

**16.** 20 AAC 05.809(b).

16.43.250(a)(2).[17] Wilber also argued that the regulations violated the Alaska Constitution's guarantee of equal protection. Wilber asked that the system be revised to "fairly weight 1996 participation," asserting that when this was done he would "qualify for sufficient points for a freely transferable permit."

The commissioners denied Wilber's petition. The commissioners' decision noted that Wilber's narrow interpretation of AS 16.43.250(a)(2) did not account for the provision's use of the phrase "when reasonable for the fishery." The commissioners saw the agency's use of an eighteen-month period as a pragmatic solution to the legislature's imposition of a moratorium in the middle of a calendar year. They reasoned that using an eighteen-month period made sense in light of "th[e] statutory mid-year cut-off, very short January season, low participation, and small poundage." The Commission noted that none of the divers commenting on the proposed and final regulations—including Wilber—had objected to this time period. The Commission thus held that its regulations did not violate the Alaska Constitution's equal protection clause.

The Commission pointed out that, even if Wilber had a valid criticism of the CFEC regulation, he failed to offer an alternative point scheme that would result in him getting his desired relief of a transferable permit. The Commission also noted that changing the regulations as proposed by Wilber would necessitate adjusting all of the existing applications; this could leave Wilber with the nontransferable permit he started with. The Commission explained that the agency had considered using seasons as suggested by Wilber in his appeal, but had rejected that alternative in a desire to satisfy the legislature's preference for measuring eligibility by calendar years as expressed in the dive fishery moratorium legislation and AS 16.43.250. The Commission concluded that changing the point system at such a late stage in the process would be detrimental because it would require recalculation of numerous completed applications very near the end of the permit process.

Wilber appealed the Commission decision to the superior court. The superior court determined that the phrase "when reasonable for the fishery" in AS 16.43.250(a) recognizes that CFEC has a "detailed knowledge about the biology, the history, the politics, the mechanics, and probably several aspects of the fishery." The superior court also ruled that weighing the hardship factors requires CFEC to make fundamental policy choices. The superior court concluded that, given agency expertise and fundamental policy concerns driving the regulation, Wilber failed to demonstrate that CFEC's regulation lacked a reasonable basis in the law. The superior court therefore denied Wilber's appeal and affirmed the Commission's decision on July 25, 2006.

Wilber appeals.

## III. STANDARD OF REVIEW

We review an agency's regulation for whether it is "consistent with and reasonably necessary to implement the statutes authorizing [its] adoption." [18] Toward this end we consider: (1) whether CFEC exceeded its statutory authority in promulgating the regulation; (2) whether the regulation is reasonable and not arbitrary; and (3) whether the regulation conflicts with other statutes or

---

17. AS 16.43.250 provides in relevant part:

(a) Following the establishment of the maximum number of units of gear for a particular fishery under AS 16.43.240, the commission shall adopt regulations establishing qualifications for ranking applicants for entry permits according to the degree of hardship which they would suffer by exclusion from the fishery. The regulations shall define priority classifications of similarly situated applicants based upon a reasonable balance of the following hardship standards:

(1) [economic dependence];
(2) extent of past participation in the fishery, including, when reasonable for the fishery, the number of years of participation in the fishery, and the consistency of participation during each year.

18. *Grunert v. State*, 109 P.3d 924, 929 (Alaska 2005) (internal quotation marks omitted) (alteration in original) (quoting *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 689 (Alaska 2001)).

constitutional provisions.[19]  When the interpretation of a statute or other question of law implicates "agency expertise as to complex matters or as to the formulation of fundamental policy," we defer to the agency's interpretation so long as it has a "reasonable basis" in the law.[20]  We have held that CFEC's implementation of the hardship provisions of the Limited Entry Act "entails both administrative expertise and the formulation of fundamental policy." [21]

## IV.  DISCUSSION

Wilber argues that AS 16.43.250(a)(2) requires CFEC to employ a calendar year of 365 days when it defines priority classifications for limiting entry into Alaska fisheries. Alternatively, Wilber argues that even if CFEC can adopt an eighteen-month qualification period, the 1995–1996 participation period that it adopted for the geoduck fishery is arbitrary and unreasonable because it collapses two seasons into a single qualification period and gives insufficient consideration to the most recent participants in the fishery. We disagree.

### A.  CFEC Acted Within Its Statutory Authority when It Combined the Pre–Moratorium 1996 Geoduck Fishery Opening and the 1995 Calendar Year.

Wilber's central argument in this case is that the legislature's use of the term "year" in AS 16.43.250 limits CFEC to measuring past participation in twelve-month increments.  Wilber argues that the meaning of the term "year" is plain, and that CFEC has failed to offer any evidence of legislative intent or judicial construction that would permit departing from that plain meaning.  Wilber argues that CFEC's authority to choose among the AS 16.43.250 hardship factors does not include the authority to "modify" those factors.  Finally, Wilber argues that CFEC's interpretation of "year" in this case

is contrary to its other regulations and normal practice.

■ CFEC maintains that "year" is subject to different interpretations, many of which exceed 365 days.  CFEC argues that it also has broad discretion to assess hardship as required by AS 16.43.250, and that its decision in this case falls well within that discretion.  CFEC contends specifically that the legislature's amendment of AS 16.43.250(a) in 1985 to use the term "when reasonable for the fishery," gave it discretion to craft point systems tailored to the peculiarities of a particular fishery.

The superior court held that CFEC's approach was reasonable, in part because the statute affords CFEC broad discretion to "account for peculiarities of a fishery."  The superior court noted that the regulation gave Wilber credit for his past participation in the fishery, consistent with the statute's purpose, and that nothing about CFEC's approach, including its treatment of the 1995 and 1996 harvests, placed the agency's rule outside of its discretionary authority.  We agree with the superior court.

The Limited Entry Act's purpose is to "promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry . . . into the commercial fisheries in the public interest and without unjust discrimination." [22]  We have held that avoiding unjust discrimination requires "ranking applicants for the limited number of permits 'according to the degree of hardship which [the fisherman] would suffer by exclusion from the fishery.' " [23]  The specific moratorium legislation in this case also required that the point system be weighted towards recent participants.[24]

These broad purposes are well served by 20 AAC 05.808.  CFEC took into account the

**19.**  *Id.* (citing and quoting *Meier v. State, Bd. of Fisheries,* 739 P.2d 172, 173 (Alaska 1987)).

**20.**  *Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 161 (Alaska 1982).

**21.**  *Id.*

**22.**  AS 16.43.010.

**23.**  *State, Commercial Fisheries Entry Comm'n v. Apokedak,* 606 P.2d 1255, 1261 (Alaska 1980).

**24.**  Ch. 125, § 1, SLA 1996.

amount of geoduck caught by divers each year, came up with a ranking system that compared each diver's catch, and awarded more points for those divers who had caught more geoduck in the most recent years preceding the moratorium. Wilber advances a narrow interpretation of the statutory term "year," and asserts that the term's meaning constrains CFEC's authority to assess hardship based on past participation. We are not convinced that the legislature intended to tether CFEC's authority in this manner.

CFEC's regulation in this case considers both factors by looking at how much geoduck a given diver caught during four different periods: 1992, 1993, 1994, and 1995 to July 1, 1996. The last, anomalous category simply measures participation during the 1995 season for all but the nineteen divers who participated in the four-day opening of the fishery in Symonds Bay prior to the 1996 mid-season moratorium. CFEC hence considers a diver's history over a number of years, and it considers the diver's history during each of those years. The regulation gives more points to divers who fished more years, more recently prior to the moratorium, and caught more geoduck. It gives fewer points to divers who fished fewer years, less recently, and caught less geoduck. The regulation thus presents a reasonable, straightforward means of evaluating the economic hardship that would befall individuals excluded from the fishery, consistent with the Limited Entry Act's mandate.[25]

The conclusion we draw from our analysis of the text is reinforced by the broad discretion afforded CFEC to craft point systems for measuring hardship. The legislature confirmed this grant of discretion by amending AS 16.43.250 in 1985, following our decision in *Rutter v. State, Commercial Fisheries Entry Commission.*[26]

In *Rutter*, we considered former AS 16.43.250(a), which provided that CFEC was to consider certain enumerated factors in assessing an applicant's degree of economic dependence on—and past participation in—a fishery.[27] We interpreted subsection .250(a) as requiring that CFEC consider all of the statutory factors, and invalidated a CFEC regulation that failed to do so.[28] The legislature responded by amending the statute in 1985 to replace the phrase preceding the enumerated factors-"including but not limited to"-with the phrase "when reasonable for the fishery."[29] The letter of intent accompanying the amending legislation stated that the legislature's intent was to allow CFEC to "disregard one or more particular hardship standards when ranking applicants if the standards were unreasonable in light of the particular fishery."[30] The letter further stated: "The legislature recognizes that patterns of participation and extent of economic dependence vary from fishery to fishery and intended that, in developing point systems for limited fisheries, [CFEC] should exercise some discretion in how to measure past participation and economic dependence."[31]

We revisited our decision in *Rutter* in a separate case not long after the legislature passed its amendment. In *Haynes v. State, Commercial Fisheries Entry Commission,*[32] we recognized that the amendment "clearly grants discretion to the CFEC to award

**25.** *See Rose,* 647 P.2d at 161.

**26.** 668 P.2d 1343 (Alaska 1983), *superseded by statute,* ch. 22, § 5, SLA 1985, *as recognized in Haynes v. State, Commercial Fisheries Entry Comm'n,* 746 P.2d 892, 894 (Alaska 1987).

**27.** Former AS 16.43.250(a) provided in relevant part:

The regulations shall define priority classifications of similarly situated applicants based upon a reasonable balance of the following hardship standards:
(1) degree of economic dependence upon the fishery, including but not limited to percentage of income derived from the fishery, reliance on alternative occupations, availability of alternative occupations, investment in vessels and gear;
(2) extent of past participation in the fishery, including but not limited to the number of years of participation in the fishery, and the consistency of participation during each year. Ch. 47, § 5, SLA 1981.

**28.** *Rutter,* 668 P.2d at 1349.

**29.** Ch. 22, § 5, SLA 1985.

**30.** 1985 Senate Journal 483.

**31.** *Id.*

**32.** 746 P.2d at 893.

points for economic dependence based on less than all four indicia, effectively overruling *Rutter*." [33] Wilber points out that the *Haynes* decision does not give CFEC carte blanche to modify factors under AS 16.43.250 once it has decided to consider them. But this was not the kind of prerogative exercised by CFEC below, nor is it the kind of authority that CFEC argues for on appeal. As CFEC notes, its approach can only be considered a "modification" if one accepts Wilber's narrow interpretation of AS 16.43.250. We decline to adopt that interpretation, however, because CFEC responded reasonably to the legislature's mid-year moratorium, a situation not expressly contemplated by the statute. This falls well within the discretion envisioned by the legislature in its 1985 amendments to AS 16.43.250, as it enables CFEC to tailor its point system to a unique circumstance of the geoduck fishery.[34]

As we have already noted, determining the hardship an individual would suffer from exclusion from a fishery requires "both administrative expertise and the formulation of fundamental policy." [35] Not only did CFEC have the broad discretion to create a geoduck fishery point system, it needed to use this discretion because the legislature's imposition of a moratorium in the middle of a year was unusual. Though Wilber notes that CFEC has not combined calendar years in other point systems, he fails to cite examples where the legislature has imposed the type of mid-year moratorium that occurred here.

The other point systems created by CFEC in response to the legislature's dive fishery moratorium were also necessarily unusual.[36] In light of the unusual circumstances presented to it, CFEC created a valid point system for measuring hardship in the geoduck fishery, and acted well within its broad discretion under the Limited Entry Act.

## V. CONCLUSION

For the reasons detailed above, we AFFIRM the decision of the CFEC.

MATTHEWS, Justice, concurring.

This concurring opinion concerns an issue that has not been properly raised and therefore is waived. I write separately because the issue may be important when other winter fisheries are made subject to limited entry.

Geoduck fishing seasons run from October through May.[1] But the CFEC measures past participation on a calendar rather than a seasonal year. This measurement can seriously distort the extent of a fisherman's past participation. A fisherman who has harvested geoduck for two seasons may have done so in one calendar year. Likewise, a fisherman who has participated in only one season may have done so in two calendar years. Since the objective mandated by statute is to measure the extent of a fisherman's past participation,[2] it seems apparent that some-

---

33.  *Id.* at 894.

34.  *See* 1985 Senate Journal 483.

35.  *Rose,* 647 P.2d at 161.

36.  *See* 20 AAC 05.814 (applying the same qualification periods for the sea cucumber fishery); 20 AAC 05.820 (evaluating hardship in the sea urchin fishery based on the total pounds caught by a diver in the twelve-and-a-half years before the moratorium).

1.  There are biological reasons for this: "Harvest for geoducks has been allowed from October 1 through May 31 to avoid the summer spawning and recovery period and to minimize paralytic shellfish poisoning (PSP) toxin levels." ALASKA COMMERCIAL FISHERIES ENTRY COMMISSION, SOUTHEAST ALASKA GEODUCK CLAM DIVE FISHERY RATIONALE FOR CFEC's REGULATORY DECISIONS 7 (Dec. 28, 2000).

In recognition of these biological reasons geoduck harvesting regulations define a registration year as starting on October 1 and ending on September 30. 5 Alaska Administrative Code (AAC) 38.146(b) (2007). All gear and vessels used to harvest geoducks must be registered and registration certificates must be kept on each vessel during harvesting. 5 AAC 38.020(c). Certificates are issued on the basis of the registration year—October 1 through September 30.

2.  AS 16.43.250(a)(2). While CFEC asserts that the language of this statute, which speaks of "the number of years of participation in the fishery," guided its decision to implement a calendar-year based participation system, "year" as used in the statute can readily mean "season." Indeed, CFEC has previously interpreted "year" as "season" in some winter fisheries. 20 AAC 05.693(a) (awarding past participation points in the Southeastern Alaska red and blue king crab pot fishery on a seasonal basis); 20 AAC 05.694(a) (award-

thing is wrong with a system that awards a one-season fisherman more points than a two-season fisherman.

But that is what has happened to Wilber. He fished in two seasons, 1994–95 and 1995–96. His 1994–95 season participation occurred in January 1995 when he harvested 1,849 pounds in Symonds Bay. In the 1995–96 season, he fished in two openings, one in October near Craig where he harvested 1,842 pounds, and one in January in Symonds Bay where he harvested 1,433 pounds. Looking at the top tier harvest thresholds established by the regulation,[3] it is evident that Wilber is an industrious and effective fisherman. Yet Wilber received credit under the regulation for only one year of participation and received only ten points. By contrast, a fisherman who participated in only one season, that of 1994–95, landing say 1,000 pounds in October 1994 and 500 pounds in January 1995, would receive nineteen points and be eligible to receive a transferrable permit.

Under Alaska law, courts may review regulations to determine whether they are reasonable and not arbitrary.[4] Successful challenges under this standard are usually process oriented. That is, courts find that the entity promulgating the regulation failed to consider some important factor. However, sometimes enactments are simply so unfair or so remotely related to reasonable objectives that they must be considered arbitrary and unreasonable on substantive grounds.[5]

I think a convincing case might be made that the regulation in question is arbitrary and unreasonable because it measures past participation on an annual rather than a seasonal basis. But this argument was not raised in the superior court and at best is only alluded to by Wilber in his briefs before this court. The issue therefore is waived.[6] As to the arguments that are properly before this court, I agree with the opinion of the court.

---

ing past participation points in the Southeastern Alaska brown king crab fishery on a seasonal basis); 20 AAC 05.695(a) (awarding past participation points in the Southeastern tanner crab pot fishery on a seasonal basis); *see also* 5 AAC 34.020(b) (king crab registration year is June 28 through June 27); 5 AAC 35.020(c) (tanner crab registration year is August 1 through July 31).

**3.** *See supra* Op. at ——.

**4.** *State v. Morry,* 836 P.2d 358, 362–64 (Alaska 1992); *Johns v. Commercial Fisheries Entry Comm'n,* 758 P.2d 1256, 1261 (Alaska 1988).

**5.** An example of a statute that operated so unfairly that it could not stand is the section of the workers' compensation act devising a formula for determining gross weekly earnings that was struck down in *Gilmore v. Alaska Workers' Compensation Board,* 882 P.2d 922 (Alaska 1994), *superceded by statute,* AS 23.30.220, *as recognized in Dougan v. Aurora Electric, Inc.,* 50 P.3d 789, 796–97 (Alaska 2002). This section was struck down on equal protection grounds because it was needlessly unfair. *Gilmore,* 882 P.2d at 928–29. It seems clear that had it been a regulation rather than a statute, the section would also have failed to pass muster under the arbitrary and unreasonable standard.

**6.** *Powercorp Alaska, LLC v. State, Alaska Indus. Dev. & Exp. Auth., Alaska Energy Auth.,* 171 P.3d 159, 165 & n. 25 (Alaska 2007) (issues not briefed or raised in administrative appeal to superior court are waived).