POWERCORP ALASKA, LLC, and Kwig Power Company, Appellants,

v.

ALASKA ENERGY AUTHORITY, Ron Miller, Kris Noonan, and Controlled Power, Inc., Appellees.

No. S–13729.

Supreme Court of Alaska.

Oct. 12, 2012.

As Amended on Rehearing Jan. 7, 2013.

Thomas R. Wickwire, Fairbanks, for Appellants.

Michael G. Mitchell, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellees Alaska Energy Authority, Ron Miller, and Kris Noonan.

Michael W. Seville, Burr, Pease, & Kurtz, Anchorage, for Appellee Controlled Power, Inc.

Before CARPENETI, Chief Justice, FABE and WINFREE, Justices.

## OPINION

CARPENETI, Chief Justice.

## I. INTRODUCTION

A quasi-independent governmental agency manages a program designed to improve power generation in small Alaska villages that are located off the electrical grid. One such village believed that the agency did not respect the wishes of village leaders in securing a contract to improve that village's power-generation facility. The village, joined by a company that produces a key component used in improving power generation in village areas, sued the agency. The plaintiffs alleged that the agency erroneously awarded contracts for power generation and that agency employees improperly disclosed the company's trade secrets to its competitor. The superior court dismissed all of the plaintiffs' claims on motions for summary judgment. Because we agree there are no disputed issues of material fact and the defendants are entitled to judgment as a matter of law, we affirm the decision of the superior court in all respects.

## II. FACTS AND PROCEEDINGS

The present appeal concerns many of the same underlying facts as *Powercorp Alaska, LLC v. State, Alaska Industrial Development & Export Authority, Alaska Energy Authority (Powercorp I)* [1] and involves some of the same parties.

1. 171 P.3d 159, 161–62, 167 (Alaska 2007). Parts II.E and II.F concern events that took place after the facts discussed in *Powercorp I.*

The Rural Power System Upgrade (RPSU) program seeks to improve power generation in small Alaska villages that are located off the electrical-grid system. The federal Denali Commission has provided grant funds to support this program. The Alaska Energy Authority, a public corporation of the State of Alaska, has received and administered grants from the Denali Commission to support the RPSU program. Through the RPSU program, the Energy Authority developed plans to provide automatic paralleling switchgear to power-generation facilities in approximately 120 small Alaskan villages. Switchgear technology "matches power generation with demand on a continuous, automatic basis." This practice helps provide more efficient power generation.

Powercorp Alaska, LLC and Controlled Power, Inc. both develop and build automatic paralleling switchgear technologies. A key component of automatic paralleling switchgear is a supervisory controller, which responds to data sent by various sensors. The supervisory controller sends instructions to engine controllers, which, in turn, adjust power generators to optimum operating speed. The supervisory controller bases its "instructions" on data received from the sensors and pre-programmed parameters. The industry standard for supervisory controllers is a "programmable logic controller" (PLC). Controlled Power has used this piece of equipment in at least two RPSU projects. By contrast, Powercorp's supervisory controller "relies on a personal computer rather than a PLC to derive the commands sent to the engine controllers." Powercorp and Controlled Power both have tried to secure, and sometimes have secured, contracts with the Energy Authority to install switchgear as part of the RPSU program.

### A. Powercorp Switchgear Technology; Information Provided To Noonan

Powercorp asserts that a key component of its switchgear system is an engine controller manufactured "under license" by Woodward, a company that makes control equipment.

This piece of technology, known as a GSS controller, receives instructions from the supervisory controller and passes them on to the power generators. The record suggests that the GSS controller is similar to the GCP-30 series controller, which is manufactured by Woodward and sold throughout the world. In response to a discovery request, Powercorp denied that the " 'Woodward engine controller, prepared as a licensed product by Woodward to Powercorp' . . . is identical to a Woodward engine controller that is available in the open market, except that it has a Powercorp faceplate." Controlled Power seems to have accepted this denial (at least for purposes of argument), describing the product Powercorp licensed from Woodward as having "the same features as the [GCP-]31 and [GCP-]32, but [with] more whistles and bells." Powercorp contends that its "use of the Woodward GCP was much more extensive than any other control system designer or manufacturer, who used it to control just one engine." Powercorp asserts that it has developed special software programs to expand the capabilities of the Woodward engine controller. It is not clear how many people—within Powercorp or Woodward—are familiar with the special capabilities of the GSS controller or the technical details of its development.

Powercorp alleges that it sent the Energy Authority a confidentiality agreement on January 10, 2003. This agreement had not been signed by March 2003, when Powercorp engineer Juergen Zimmerman met with Energy Authority employee Kris Noonan. At this meeting, Zimmerman explained how the Woodward GCP Engine Controller could be added to the Energy Authority system. In a document entitled "affidavit" but which was not notarized, Zimmerman stated that he demonstrated to Noonan how and where to wire the engine controller by drawing on a wiring diagram that Noonan provided. Powercorp alleges that this information was disclosed to Noonan with the understanding that it would not be communicated to others outside the Energy Authority.[2] This was,

---

**2.** The Energy Authority signed a confidentiality agreement in August 2004. It is not clear if this agreement was received before or after the March 2003 meeting.

according to Powercorp, "the only incident of disclosure that there is any evidence of."

The Energy Authority admits that in the spring of 2003, Noonan discussed technical functions of the Powercorp system with Zimmerman, as part of what Noonan perceived to be a Powercorp "sales pitch." The Energy Authority states that "Mr. Noonan gave Mr. Zimmerman drawings of a switchgear system that had been designed by [the Energy Authority], built by Controlled Power, and installed by [the Energy Authority] in Tuluksak in order for Powercorp to consider whether, and to show [the Energy Authority] how, Powercorp could provide a system meeting this design." In a later affidavit, Noonan states, "[Zimmerman's] drawing may have included the Woodward controller, but it was not of interest or concern to me how to wire the Woodward GCP controller or any other Woodward controllers into [the Energy Authority's] system—since [the Energy Authority] was very familiar with Woodward controllers and this information was available from Woodward." In the same affidavit, Noonan denies the allegation that Zimmerman showed Noonan "how to wire the Woodward GCP Engine Controller into a schematic drawing of the [the Energy Authority's] current system" and denies asking Zimmerman to do so.

## B. Demonstration Sites: Stevens Village And Golovin

In November 2003, the Energy Authority approved a waiver for alternative procurement methods. This waiver authorized the Energy Authority to award sole-source (non-competitive) contracts for two RPSU program sites: Stevens Village and Golovin. Through this non-competitive process, Powercorp and Controlled Power were each awarded a contract to design and build fully automatic switchgear for one of the villages. Powercorp alleges that the sole-source procurement of the Controlled Power system was part of a plan to position Controlled Power to obtain other RPSU contracts.

The Energy Authority justified the sole-source procurement on the ground that it would allow the Energy Authority to compare and evaluate different switchgear systems.[3] "While Controlled Power intended to install PLC switchgear, Powercorp would showcase its PC-based system, which would be the first of its kind in the United States."[4] The final specifications for the demonstration sites were developed after the waiver authorizing sole-source contracts was approved. In August 2004, after the bid specifications were issued, Powercorp sent the Energy Authority a second confidentiality agreement, which was then signed by an Energy Authority representative.

## C. Invitation To Bid REG 04–230 For Eight Other Villages Including Kwigillingok

While installation at the demonstration sites was underway, the Energy Authority arranged installation of switchgear at other villages. In 2004, the Energy Authority solicited bids for the installation of automatic switchgear systems in eight villages: Arctic Village, Hughes, Kongiganak, Koyukuk, Kwigillingok, Manokotak, Nikolski, and Pedro Bay. The Energy Authority solicited bids through a competitive process, issuing ITB [invitation to bid] No. REG–04–230. The winning bidder would contract to install switchgear in all eight villages.

Bid specifications for ITB REG 04–230 were developed by engineering consultant Brian Gray. The Energy Authority states that specifications are developed through an "iterative" process. The parties agree that the REG 04–230 specifications were based, in part, on the specifications used for the Stevens Village switchgear installation. The specifications required use of an Allen–Bradley PLC supervisory controller and Woodward GCP–31 engine controller. Powercorp asserts that this bid specification disclosed to Controlled Power key information that Noonan had learned about the Woodward component and how to connect it. Controlled Power asserts that it had used a Woodward GCP–30 series engine controller in its switchgear systems as early as 2001. The Ener-

**3.** *Powercorp I,* 171 P.3d at 162, 168.

**4.** *Id.* at 162.

gy Authority has included Woodward engine controllers in contract solicitations at least since 2004.

As the only responsive bidder, Controlled Power was awarded the eight-village switchgear-installation contract described in ITB REG 04–230. Powercorp did not submit a bid; it had "no intention" to submit a bid using PLC technology.[5] In *Powercorp I*, we affirmed the award of the eight-village contract to Controlled Power.[6] In that case, Powercorp argued that the invitation to bid failed to provide critical information and gave Controlled Power an unfair advantage.[7] But we affirmed the administrative hearing officer's conclusion that the invitation to bid provided sufficient information to prepare a competitive bid and the officer's alternative conclusion that "[e]ven if the information had been deficient, Powercorp would not have standing to object, because it had no intention of submitting a bid using a PLC, and the general rule is that only a prospective bidder has standing to protest the terms of a solicitation."[8]

### D. Kwigillingok Power Plant Upgrade Project

The Native Village of Kwigillingok (Kwigillingok) is one of the villages covered by the REG 04–230 invitation to bid. In June of 2002, representatives of the Energy Authority and Kwigillingok signed a grant agreement concerning the Kwigillingok Power Plant Upgrade Project. The agreement designates Kwigillingok as the grantee and the Energy Authority as both the grantor and the grantee's agent.

The agreement provided that upon receipt of funds from the Denali Commission, the Energy Authority would grant Kwigillingok "funds for the construction of the Project and performance of the Project work under the terms outlined in this agreement." The original agreement provided that the Energy Authority would "grant funds to pay for expenses incurred by the Grantee that are authorized under this Agreement, in an amount not to exceed $210,000" and that performance would be completed "no later than December 31, 2003." These terms appear to have been amended, as the project took more time and became more expensive than the parties first expected. Performance deadlines were extended until the end of 2005. It appears that the Denali Commission agreed to contribute over $258,000 for the project.

The grant agreement assigned the Energy Authority primary responsibility for managing the project:

> The Authority will serve as the Grantee's agent for the design and construction management of the Project, including, but not limited to, where applicable, issuing Invitations to Bid and selecting contractors. The Authority will be responsible for all matters related to the Project design and construction, including, but not limited to: approval of plans and specifications; choices of scheduling, manpower, and methods; procedures for administering the Project; procurement of materials; insurance during construction; disposition of surplus equipment; payment of all Project billings; complying with all federal reporting requirements (except as [otherwise] provided ...); performance of final project inspection; and issuance of a Notice of Project Completion.

The parties disagree about the nature of the duties the Energy Authority owed to Kwigillingok under this agreement. The complaint asserted that the Energy Authority administers federal Denali Commission funds "under a trustee relationship for the benefit of ... rural Alaska villages," including Kwigillingok. The Energy Authority rejects this characterization.

The agreement assigns the grantee responsibility for other aspects of the project, including securing permits and real property for the power generation site and serving as a liaison between the Energy Authority and the local community. The parties agree that the grantee Kwigillingok is responsible for

**5.** *Id.* at 163.

**6.** *Id.* at 161.

**7.** *Id.* at 162.

**8.** *Id.* at 171.

future "operation and maintenance costs" associated with the switchgear system. Under the grant agreement, Kwigillingok is also responsible for "reviewing project documents and monitoring the Project work to the extent necessary for Grantee to determine that the work is proceeding satisfactorily...." The agreement adds:

> The Grantee will promptly raise with the Authority any concerns or issues it may have regarding the Project, and if those concerns or issues are not satisfactorily resolved will promptly give written notice with a detailed description of the concerns or issues to the Authority's contact[.]

As the only responsive bidder, Controlled Power was awarded the eight-village switchgear-installation contract that covered Kwigillingok.[9] Implementation of the Kwigillingok project was delayed as a result of the protest appeal concerning ITB REG 04–230. On September 13, 2004, the hearing officer issued a decision recommending that Powercorp's protest appeal be denied and the Controlled Power contract proceed as planned. Powercorp appealed this decision to the superior court and later to this court; the contract was not stayed pending the outcome of those appeals. On September 27, 2004, the installation contract was awarded to Controlled Power.

William Igkurak, Kwigillingok's facilities director, sent two letters to the Energy Authority expressing his disapproval of the decision to award the contract to Controlled Power and his desire to have a "wind-ready" Powercorp switchgear system installed. The first letter was sent on October 5, 2004, and the second letter was sent on November 9, 2004. Mike Harper, the Energy Authority's deputy director, responded to each letter within ten days. Harper's first letter stated that the switchgear-installation contract with Controlled Power could be cancelled under certain circumstances (*i.e.* if cancellation was in the best interests of the Energy Authority); that if the Kwigillingok portion of the contract were canceled, the Energy Authority would be liable for approximately $12,000 in terminations costs; and that cancellation of the contract would not guarantee installation of the Powercorp system because procurement would be governed by federal purchasing rules.

Igkurak's second letter stated, "We would like to place an immediate hold on the Controlled Power control system, and proceed immediately with the procurement process to substitute a Powercorp wind-ready system." Harper's reply stated that "[t]he regulations do not allow [the Energy Authority] to enter into a sole-source (non-competitively procured) contract with Powercorp," and that "[i]f the Native Village of Kwigillingok is willing to pay all increased costs, the President òr other authorized representative of the Native Village of Kwigillingok (Grantee) should send us a letter that so indicates." Al Ewing, a representative of the Denali Commission who was copied on Mr. Igkurak's letters, sent a response on November 22, 2004. Ewing wrote that he "cannot support the alteration or amendment of any portion of the financial assistance award for [Kwigillingok's] power system upgrade. If the Native Village of Kwigillingok is determined to alter the project, it must be prepared to accept responsibility for any additional costs incurred...." The Energy Authority asserts that Kwig Power Company (Kwig Power), a division of the Native Village of Kwigillingok, did not respond to Harper's second letter or Ewing's letter; Kwig Power does not deny this.[10]

### E. Invitation To Bid REG 05–067 For Another Five Villages

In the next stage of RPSU implementation, the Energy Authority invited bids for the installation of switchgear in five more villages: Chuathbaluk, Crooked Creek, Sleetmute, Stony River, and Takotna. This invitation to bid was labeled ITB No. REG 05–067; it was not considered in *Powercorp I.* The REG 05–067 solicitation was based in part on the REG 04–230 invitation to bid;

---

**9.** *Id.* at 162.

**10.** The parties seem to agree that for the purposes of this appeal Kwig Power Company and the Native Village of Kwigillingok are a single legal entity.

the Energy Authority revised the solicitation it had used for the earlier eight-village contract in an effort "to make alternative [non-PLC] systems responsive." The new solicitation required each prospective contractor to submit a bid identifying, as Option 1, how it would create a switchgear system using an Allen–Bradley supervisory controller; alternatively, the solicitation allowed the bidder to identify, as Option 2, how it would create a switchgear system assuming certain equipment substitutions were allowed. The solicitation provided that "[a]ward will be made on the lowest priced responsive and responsible bid for either Option 1 or Option 2. [The Energy Authority] may decide to choose between Option 1 or Option 2 if selection of either option would not change the ranking of the bidder."

The Energy Authority and Powercorp interpreted this language differently. Before the bidding period opened, Powercorp filed a protest with the Energy Authority. When the protest was denied, Powercorp appealed and sought an administrative hearing. The hearing officer explained:

> As Powercorp understood the invitation, even if Powercorp's bid for the Powercorp system was lower than any other bid, including all of the Option No. 1 bids, the energy authority would have had the discretion to reject the Powercorp system and choose the lowest-priced Option 1 bid. For that reason, and because it had no intention of supplying a system in conformity with Option 1, Powercorp filed a protest and did not submit a bid on either option.... [T]he energy authority's intent was that the award would be made to the bidder who made the lowest bid for either Option No. 1 or Option No. 2 from among all of the bids submitted, and that the authority retained discretion to choose that bidder's other option, but only if that bidder's other option was also the lowest bid for that option. Under the authority's understanding, if Powercorp's Option No. 2 bid (the Powercorp proprietary system) was the lowest of all bids on either option, then the authority was obligated to award the contract to Powercorp, and could only switch to Option No. 1 (the energy authori-

ty's system) if Powercorp's Option No. 1 bid was also the lowest bid on that option.

Powercorp also argued that it should not have been required to submit a bid on Option No. 1 in order to submit a bid on Option No. 2. The Energy Authority argued that a bid on Option No. 1 was required "in order to ensure that bidders fully understand our system requirements and provide a system that offers similar performance and has similar layout and construction." The hearing officer dismissed Powercorp's argument as moot because Powercorp had not shown that, but for the Option 1 requirement, it would have been the successful bidder.

Powercorp also argued that the Energy Authority had abused its discretion by issuing an invitation to bid, seeking competitive bids that met certain design standards, instead of issuing a request for proposals, seeking proposals that met performance criteria. The hearing officer concluded that AS 36.30.100 provides the Energy Authority with discretion to proceed with competitive bidding in this case and that the Authority had not abused its discretion.

## F. Civil Claims

The underlying facts of this case were in dispute as early as June 2004 when Powercorp protested ITB REG 04–230 invitation to bid. This case was initiated in superior court when Powercorp and Kwig Power alleged various civil claims against Controlled Power, the Energy Authority, Energy Authority Executive Director Ron Miller, Energy Authority employee Kris Noonan, and other defendants who are not parties to this appeal. An initial complaint was filed on August 11, 2006, identifying the defendants listed above and two plaintiffs, Powercorp and Harvey Paul, manager of the Puvurnak Power Company of Kongiganak. Kwig Power was not identified as a plaintiff in the original complaint, nor was the Native Village of Kwigillingok. On December 18, 2006, the First Amended Complaint was filed, listing the same defendants. The amended complaint listed Powercorp and Kwig Power Company as plaintiffs; it did not list Harvey Paul, the Puvurnak Power Company, or the village of Kongiganak as plaintiffs. On April 1, 2008, Powercorp and

Kwig Power filed the Second Amendment Complaint, listing all the same parties as the prior complaint.

In its Second Amended Complaint, Powercorp alleged that Kwig Power was damaged as a result of the Energy Authority's refusal to install the Powercorp control system (Count I). The complaint suggested that Kwig Power's damages consist of future "operation and maintenance costs," noting that "the Powercorp system ... had been shown to save up to 50% of the fuel costs when installed in [similar] towns...." Kwig Power also asserted claims against Noonan for working to exclude the Powercorp system from the Kwig Power procurement (Count III) and against Miller for failing to ensure compliance with procurement laws and competitive bidding (Counts VI, VII).

Powercorp asserted claims against Noonan for interference with prospective economic advantage and misappropriation of a Powercorp trade secret under AS 45.50.910 et seq. (Counts III, IV). Powercorp alleged that Controlled Power was liable for unjust enrichment as a result of the trade-secret misappropriation and liable for colluding with other defendants to inhibit competition (Counts V, VIII). Powercorp further alleged that it was also damaged as a result of Miller's "negligent failures to act" and Miller's improper decision to authorize sole-source procurement for the demonstration project awarded to Controlled Power (Counts VI, VII).

The Energy Authority, Noonan, and Miller submitted an answer that largely denied the plaintiffs' allegations and raised several affirmative defenses. Controlled Power filed a similar answer. The defendants later moved either for dismissal under Rule 12(b)(6) or for summary judgment.

On July 21, 2008, the superior court dismissed most of the claims against the Energy Authority, Noonan, and Miller. The claims against Controlled Power were dismissed in February 2009, following a hearing. The final claim, alleging trade-secret misappropriation by Noonan, was dismissed at a hearing in September 2009. Controlled Power and Noonan lodged proposed written findings and conclusions following the oral rulings in which the superior court dismissed claims against them; the court signed these orders in June 2009 and October 2009. In November 2009, the superior court entered final judgment.

During the course of this multi-year litigation, the superior court made a number of procedural rulings, which are addressed, as necessary, in Part IV.H.

Powercorp and Kwig Power appeal. Their appeal addresses the superior court's decision to dismiss their claims in addition to several rulings concerning discovery and timing.

## III. STANDARD OF REVIEW

 Orders granting summary judgment are reviewed de novo.[11] The applicability and scope of official immunity present questions of law, which we review de novo.[12] The applicability of res judicata and collateral estoppel raises questions of law, which we review de novo.[13] We generally review procedural decisions of the superior court for abuse of discretion.[14] "We may affirm the superior court on any basis supported by the record, even if that basis was not considered by the court below or advanced by any party." [15]

## IV. DISCUSSION

### A. Collateral Estoppel

There is no dispute that the facts underlying this case overlap significantly with the facts of *Powercorp I*. Issues resolved in prior litigation may limit the scope of questions

11. *Smith v. Stafford*, 189 P.3d 1065, 1070 (Alaska 2008).

12. *Weed v. Bachner Co.*, 230 P.3d 697, 699 (Alaska 2010).

13. *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 152 P.3d 460, 465 (Alaska 2007).

14. *Prentzel v. State, Dep't of Pub. Safety*, 169 P.3d 573, 592 (Alaska 2007) (citing *Balough v. Fairbanks N. Star Borough*, 995 P.2d 245, 254 (Alaska 2000)).

15. ; *Smith*, 189 P.3d at 1070 (quoting *Gilbert M. v. State*, 139 P.3d 581, 586 (Alaska 2006)).

before us now, if collateral estoppel applies. Thus, we consider first whether collateral estoppel applies so as to preclude our consideration of any issues raised by Powercorp and Kwig Power.

■ The Energy Authority, Miller, and Noonan urge us to apply collateral estoppel to affirm the superior court's dismissal of several claims. Powercorp and Kwig Power contend that the collateral estoppel doctrine does not resolve the present dispute. Collateral estoppel prohibits a party from re-litigating an issue of fact if the following four factors are met:

> (1) the party against whom the preclusion is employed was a party to or in privity with a party to the first action; (2) the issue precluded from relitigation is identical to the issue decided in the first action; (3) the issue was resolved in the first action by a final judgment on the merits; and (4) the determination of the issue was essential to the final judgment.[16]

But we have recognized that it is not always possible to resolve a case through collateral estoppel, even if that case arises from the same underlying facts and theory as prior litigation.[17]

■ The Energy Authority correctly argues that collateral estoppel can be asserted defensively. It does not matter if Noonan, Miller, or Controlled Power were not parties to Powercorp I. What matters is that Powercorp—"the party against whom the preclusion is employed"—was a party to the prior action.[18] The first element of collateral estoppel is satisfied with respect to Powercorp's claims.

But the other elements are less straightforward, and we agree with Powercorp that the appellees cannot satisfy all the elements of collateral estoppel. "One of the most difficult problems in the application of [collateral estoppel] is to delineate the issue on which litigation is, or is not, foreclosed by the prior judgment."[19] In isolating which issues from *Powercorp I* are identical to issues in the present case, we consider a number of factors, such as:

> Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? How closely related are the claims involved in the two proceedings? [20]

In *Powercorp I*, we considered "whether the Energy Authority showed 'illegal favoritism' to Controlled Power ... by 'working with it to design its system[,] then specifying it in the [REG 04–230] ITB.' "[21] The same invitation to bid is a subject of the present case. And Powercorp has made a similar argument here: Powercorp has alleged that Controlled Power colluded with Noonan in order to ensure that only Controlled Power could successfully bid on the switchgear installation contract for the first eight villages. However, the claims in this case go beyond the scope of the issues litigated in *Powercorp I*. *Powercorp I* dealt with an illegal favoritism claim based on a theory that Controlled Pow-

16. *State, Dep't of Health & Soc. Servs., Office of Children's Servs. v. Doherty,* 167 P.3d 64, 71 (Alaska 2007) (quoting *Powers v. United Serv. Auto. Ass'n,* 6 P.3d 294, 297 (Alaska 2000)).

17. *Latham v. Palin,* 251 P.3d 341, 345 (Alaska 2011) (applying discretionary immunity doctrine to claims not barred by collateral estoppel in Latham's third challenge to legislation affecting his right to criminal-sentence appeal).

18. *Smith,* 189 P.3d at 1075 ("[Defendants] Stafford and Cox have met their burden under the first element because [Plaintiff] Smith was a party to the original CINA case.").

19. RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c (1982).

20. *Id.; see also Matanuska Elec. Ass'n v. Chugach Elec. Ass'n,* 152 P.3d 460, 468 (Alaska 2007) ("A comparison of the issues reveals that precisely the same questions that would be considered ... in adjudicating MEA's breach of contract claim were resolved through the Commission's Order 26.").

21. *Powercorp I,* 171 P.3d 159, 164 (Alaska 2007).

er maintained undue influence on the procurement process.[22] Here, Powercorp brings a trade secret misappropriation claim, an accompanying unjust enrichment claim against Controlled Power, and civil claims against several individuals. Although the claims may have some similarities, the legal analysis differs for these new claims. Moreover, the underlying facts are not identical. *Powercorp I* only addressed the sole-source procurement at the two demonstration sites and the invitation to bid on the eight villages. These new claims also incorporate the special issues of the Kwigillingok installation, the invitation to bid in five more villages, and disputes regarding disclosure and secrecy. Because the scope of this suit is much broader than the issues addressed in *Powercorp I*, collateral estoppel is not appropriate here.

In addition, the determinations in *Powercorp I* were not essential to a final judgment on the merits, as required by the third and fourth elements of the collateral estoppel doctrine. In *Powercorp I*, Powercorp waived the argument that the Energy Authority bore the burden of proof on its chosen method of procurement.[23] Moreover, judgment against Powercorp in that case was justified on the alternative ground that Powercorp lacked standing to protest the procurement.[24] For these procedural reasons, the determination that there was no "illegal favoritism" was not "essential" to the final judgment; indeed, there was no such conclusive determination in *Powercorp I*. Accordingly, *Powercorp I* was not a judgment on the merits that supports the application of collateral estoppel in the present case. Thus, we turn to an analysis of each count of the complaint and the affirmative defenses of absolute and qualified immunity.

**22.** *Id.* at 164.

**23.** *Id.* at 165.

**24.** *Id.*

**25.** The partial dissent would remand the immunity issue because it was "never raised in the ... trial court." However, remand is not necessary as we have held that "[w]e may affirm the superior court on any basis supported by the record, even if that basis was not considered by the court below or advanced by any party." *Smith v.*

## B. Official Immunity

■ Because the application of absolute or qualified immunity could bar several of the appellants' claims,[25] we address these defenses before analyzing each claim. Miller and Noonan contend that claims against them are barred by official immunity. Powercorp does not respond to these contentions in its brief, but Kwig Power does argue that both Noonan and Miller are not entitled to immunity. Official immunity shields government employees from defending themselves against claims arising out of discretionary acts undertaken in the course of official duties.[26] We have explained that "a public employee ... may not be held liable for acts done in line of official duty involving a mistake in judgment or discretion, or because of erroneous interpretation and application of law...."[27]

The complaint in this case includes claims against Noonan for tortious interference with prospective economic advantage and misappropriation of a trade secret; it also includes claims against Miller for negligent supervision of Noonan and improper approval of sole-source procurement. Powercorp and Kwig Power argued in the superior court that approval of the sole-source procurement for the Stevens Village demonstration site helped position Controlled Power to obtain other contracts because it allowed the defendants to exchange information that was incorporated into the specifications for the next two switchgear-installation contracts (REG 04–230 and REG 05–670). According to the complaint, the invitations to bid for the next two contracts were "in effect" sole-source procurements directed to Controlled Power. Powercorp and Kwig Power have pointed to

*Stafford,* 189 P.3d 1065, 1070 (Alaska 2008) (quoting *Gilbert M. v. State,* 139 P.3d 581, 586 (Alaska 2006)).

**26.** *Aspen Exploration Corp. v. Sheffield,* 739 P.2d 150, 159–60 (Alaska 1987) ("As our prior decisions in this area indicate, we are of the opinion that some form of immunity for public officials is necessary simply to insure that government continues to function.").

**27.** *Id.* at 153 (quoting *State v. Stanley,* 506 P.2d 1284, 1292 (Alaska 1973)).

the following actions to support their claims: (1) Noonan's preparation of a competitive-bid waiver for the demonstration sites; (2) Miller's approval of the competitive-bid waiver; (3) communications between Noonan and the RPSU contractors; (4) solicitation of REG 04–230 and REG 05–670 contracts through the invitation to bid process (instead of requests for proposals); and (5) publishing contract specifications that require an Allen–Bradley supervisory controller and Woodward engine controller. These are all discretionary actions undertaken in the course of official duties; in the words of the Energy Authority, these acts required the defendant officials to use discretion and judgment and to consider various alternatives in "[d]etermining the particularized needs of the Alaska Energy Authority RPSU communities and the specific types of upgrades and technical equipment that are responsive to energy needs of Alaska's rural communities." Because the claims against Noonan and Miller arise out of official discretionary conduct, official immunity applies to these claims.

▉▉▉ Now we must determine whether absolute or qualified immunity applies to Miller's and Noonan's conduct. Qualified immunity shields government employees from liability if their actions are done in good faith without malice or corruption.[28] Certain government officials are entitled to the broader protections of absolute immunity;[29] when such immunity applies, a court should dismiss claims without any inquiry into the motive of the official defending the suit.[30] In determining whether an official is entitled to absolute or qualified immunity, we have considered three factors: (1) the nature and importance of the function performed by the officer; (2) the likelihood that the officer will be subjected to frequent accusations of wrongful motives and how easily the officer could defend against such allegations; and (3) the availability to the injured party of other remedies or other forms of relief.[31] We have been reluctant to "cloak" public officials with absolute immunity in all cases.[32] Qualified immunity applies unless a government official in a particular case presents adequate evidence to show that the official, discretionary acts underlying the case warrant absolute immunity.[33]

The Energy Authority and Noonan concede that Noonan is not entitled to absolute immunity,[34] but they argue that, as a high-level official, Miller is entitled to absolute immunity.[35] But Miller did not present specific evidence to satisfy the three-part test.[36] As Powercorp notes, relief available through the bid-protest process is limited;[37] this counsels against the application of absolute immunity. Although the procurement of switchgear equipment appears to play an important role in improving rural power gen-

---

28. *Id.* at 158 ("Under a rule of qualified immunity, a public official is shielded from liability only when discretionary acts within the scope of the official's authority are done in good faith and are not malicious or corrupt.").

29. *See, e.g., Whalen v. Hanley*, 63 P.3d 254, 258 (Alaska 2003) ("Legislative immunity, where it applies, is absolute, and not merely qualified.").

30. *Aspen*, 739 P.2d at 158 ("[Absolute] immunity applies whether the allegedly tortious conduct was done maliciously, corruptly, or in bad faith.").

31. *Id.* at 159–60.

32. *Id.* at 158 ("[Q]ualified immunity is sufficient to protect the honest officer who tries to do his duty.").

33. *Id.* at 159 ("We perceive no logical or compelling reason why a public official should always be entitled to absolute immunity.").

34. This position is consistent with our holding in *Weed v. Bachner Co.*, 230 P.3d 697, 704 (Alaska 2010) (concluding procurement official was entitled to qualified immunity for allegedly tortious conduct arising out of bid evaluations).

35. *Smith v. Stafford*, 189 P.3d 1065, 1073 ("[G]enerally 'absolute immunity applies only to judges, legislators, and the highest executive officers of various levels of government.'").

36. *Weed*, 230 P.3d at 701 ("Although it might sound intuitively correct that qualified immunity would increase the likelihood of tort suits in this context, as the officials argue, intuition alone is not sufficient: In evaluating this factor in the past, we have required empirical evidence that frequent suits are likely.").

37. AS 36.30.585(c) ("[I]f a protest is sustained in whole or part, the protester's damages are limited to reasonable bid or proposal preparation costs.").

eration, this is insufficient to tip the balance in favor of absolute immunity. We conclude that qualified immunity applies to both Miller's and Noonan's conduct in this case; thus, the appellants must present evidence of bad faith, malice, corruption, or other outrageous conduct in order for the claims against Miller and Noonan to survive summary judgment.[38]

To the extent that Powercorp and Kwig Power alleged bad faith on the part of Miller, that claim was unsupported by the record and consisted of mere accusations. They point to no record evidence that would support bad faith on Miller's part. As noted above, Powercorp did not respond at all on the immunity issue in its reply brief in this court. Kwig Power did address the issue, but, as to Miller, did no more than advance broad policy arguments concerning the interests of Alaska's villages in obtaining state-of-the-art control systems. Neither appellant claimed that the issue was not raised below or that our consideration of this alternative ground for affirmance—raised in detail by appellees the Energy Authority, Miller, and Noonan—would be unfair to them. Under these circumstances, we conclude that official immunity provides an alternative basis to uphold the superior court's dismissal of Counts VI and VII against Miller.

With respect to Noonan, the allegations of Powercorp and Kwig Power are more robust. They allege that Noonan engaged in "intentional wrongdoing" to advance his own "financial and career interests." They further suggest that Noonan, in bad faith, destroyed documents related to this litigation. Powercorp also alleges in its reply brief that Noonan "pressur[ed] or threaten[ed] Powercorp to induce it to sell or make available ... its control system." With respect to Noonan, the appellants have produced sufficient evidence of bad faith to survive summary judgment. Thus, we address the merits of the claims against Noonan—Counts III and IV—below.

## C. It Was Not Error For The Superior Court To Dismiss Count I–Kwig Power's Claim That The Energy Authority Caused It Injury.

Kwig Power alleges that it was harmed as a result of the Energy Authority's refusal to install the Powercorp control system. It suggests that damages consist of future "operation and maintenance costs" and that "the Powercorp system ... had been shown to save up to 50% of the fuel costs when installed in [similar] towns...." Kwig Power does not specify what kind of duty the Energy Authority allegedly breached, but its pleadings and briefing implicate several areas of law including contract obligations, tort duties, and fiduciary relationships.

The Energy Authority argues that Kwig Power's claim is barred by estoppel or waiver. It maintains that by not responding to the Energy Authority's letter of November 19, 2004, Kwig Power led the Energy Authority to believe that it would not protest the installation of the Controlled Power system and forfeited any claim to that effect. The Energy Authority further argues that even if Kwig Power had presented a viable breach of contract claim, it would be "barred because the Village of Kwigillingok breached its obligations under the grant agreement." The Energy Authority rejects Kwig Power's characterization of the Energy Authority as a trustee.

▬ Waiver, or the intentional relinquishment of a known right, can be accomplished by an express statement or by conduct that is "inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party." [39]

▬ In this case, the grant agreement describes the Energy Authority as Kwig Power's "agent for the design and construction management of the Project, including, but not limited to, where applicable, issuing Invitations to Bid and selecting contractors."

**38.** *Aspen,* 739 P.2d at 158 (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 132 at 989 (4th ed. 1971) ("[O]fficial immunity should not become a cloak for malicious, corrupt, and otherwise outrageous conduct on the part of those guilty of intentional abuse of power....")).

**39.** *Carr–Gottstein Foods Co. v. Wasilla, LLC,* 182 P.3d 1131, 1136 (Alaska 2008) (quoting *Milne v. Anderson,* 576 P.2d 109, 112 (Alaska 1978)).

It assigns to the Energy Authority "responsib[ility] for all matters related to the Project design and construction, including but not limited to: approval of plans and specifications; ... procedures for administering the Project; [and] procurement of materials." These terms explicitly authorized the Energy Authority to solicit bids for the installation of switchgear in Kwigillingok, to enter a contract with the sole responsive bidder, and to finalize specifications for the installation of that switchgear. The contract sets out the understanding that the Energy Authority will comply with procurement laws in its efforts to solicit bids and secure a switchgear contract. Although Kwig Power expressed to the Energy Authority some reservations about the contracting process, it did so only after the contract was awarded to Controlled Power and never responded to the Energy Authority's November 19 letter about terminating the Controlled Power contract.

Under these circumstances, we agree with the Energy Authority that Kwig Power waived its right to protest the installation of Controlled Power switchgear. It forfeited this claim by leading the Energy Authority to believe that it acceded to the installation.

Our position is not changed by Kwig Power's assertion in the complaint that the Energy Authority administers federal grant funds "under a trustee relationship" for the benefit of Kwig Power and other villages. Kwig Power waived this argument by failing to adequately brief it.[40] We affirm the superior court's decision to dismiss Count I.

**D. It Was Not Error For The Superior Court To Dismiss That Part Of Count III Setting Out Kwig Power's Claim Against Noonan For Working To Exclude The Powercorp System From The Kwigillingok Procurement.**

Kwig Power asserts separate claims against Noonan for working to exclude the Powercorp system from the Kwigillingok procurement (Count III). The Energy Authority and Noonan defend the superior court's decision to dismiss this claim on various grounds, including waiver, statute of limitations, immunity, and other grounds. Here, too, we conclude that the claim is barred by waiver. As discussed in Part IV.B, the behavior of Kwig Power led the Energy Authority and its employees to believe that Kwig Power acceded to the installation of a Controlled Power system. We affirm the superior court's dismissal of this claim.

**E. It Was Not Error For The Superior Court To Dismiss That Part Of Count III Setting Out Powercorp's Claim Against Noonan For Intentional Interference With Prospective Economic Advantage.**

Powercorp asserts a claim against Noonan for intentional interference with prospective economic advantage. To establish a claim of intentional interference with prospective economic advantage, the plaintiff must provide evidence of:

(1) the existence of a prospective business relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship, and intent to prevent its fruition; (3) conduct by the defendant interfering with the relationship; (4) failure of the prospective relationship to culminate in pecuniary benefit to the plaintiff; (5) causation of the plaintiff's damages by the defendant's conduct; and (6) absence of privilege or justification for the defendant's action.[41]

Powercorp's intentional interference claim is premised on the notion that Powercorp has an existing prospective business relationship *with* the Energy Authority, but it has not met this threshold requirement. Procurement laws entitle Powercorp to a fair bidding process in which no particular contractor is

---

**40.** *See Hidden Heights Assisted Living, Inc. v. State, Dep't of Health & Soc. Servs., Div. of Health Care Servs.,* 222 P.3d 258, 270 n. 60 (Alaska 2009) (holding an argument to be "waived for inadequate briefing and failure to raise the issue in the statement of points on appeal"); *Adamson v. Univ. of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

**41.** *J & S Servs. v. Tomter,* 139 P.3d 544, 551 (Alaska 2006).

favored from the outset. Submitting a bid entitles the bidder to "fair and honest consideration." [42] Submitting a bid does not provide any one bidder with a contract expectancy superior to the rights of other bidders. [43] In this case, Powercorp did not submit a bid; the bid-protest hearing officer concluded that "Powercorp could have responded, substituting an Allen–Bradley PLC controller for its own controller, but it chose not to because . . . it is not interested in building systems using other controllers." Powercorp has not produced other evidence to contradict the hearing officer's conclusion. Powercorp has not shown that but for Noonan's interference, it expected to enter a contract with the Energy Authority from which it would derive economic benefits. The superior court did not err in dismissing Count III.

### F. It Was Not Error To Dismiss Count IV—Powercorp's Claim That Noonan Misappropriated A Trade Secret.

■ Count IV of the complaint alleges that Noonan misappropriated a Powercorp trade secret and that Controlled Power was unjustly enriched as a result. The parties agree on the outlines of the governing law: A trade secret misappropriation claim cannot be established unless the plaintiff had a trade secret that was communicated to the defendant in circumstances giving rise to a duty of secrecy. [44] Alaska's Uniform Trade Secrets Act defines the relevant terms. [45]

### 1. Trade secret

Alaska Statute 45.50.940(3) provides the following two-part definition for the term "trade secret":

"[T]rade secret" means information that

(A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. [46]

The first part of this definition asks if the alleged trade secret is something worthy of being kept secret, and the second part of the definition asks if the alleged trade secret was actually kept secret to a reasonable degree. The following six factors have been used to determine whether information constitutes a trade secret under Missouri's trade secret statute, which adopts the same two-part definition found in AS 45.50.940(3):

(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. [47]

---

**42.** *King v. Alaska State Hous. Auth.*, 633 P.2d 256, 261 (Alaska 1981) ("[A]n agency, in soliciting bids, implicitly contracts to give those bids fair and honest consideration.").

**43.** *Id.* at 260 ("[T]he distinction between appellants and any other disappointed bidders amounts to nothing more than the right to the award of the contract in the unlikely event of an ASHA decision that the merits of their proposal were exactly equal to those of the best of the competing proposals.").

**44.** *See, e.g., Utah Med. Prods., Inc. v. Clinical Innovations Assocs.*, 79 F.Supp.2d 1290, 1311 (D.Utah 1999) (citing *Water & Energy Sys. Tech., Inc. v. Keil*, 974 P.2d 821, 822 (Utah 1999)).

**45.** *See* AS 45.50.930 (incorporating by reference AS 45.50.910–.945).

**46.** *See also State, Dep't of Natural Res. v. Arctic Slope Reg'l Corp.*, 834 P.2d 134, 137–38 (Alaska 1991) (considering definition of "trade secret" in determining whether appellee had a "property interest" as part of unconstitutional-taking analysis and concluding that DNR did not effect an unconstitutional taking of the appellee's proprietary well-drilling data); RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (1939) ("A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.").

**47.** *Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F.Supp.2d 923, 926 (E.D.Mo.2010) (quoting *Cerner Corp. v. Visicu, Inc.*, 667 F.Supp.2d 1062, 1077–78 (W.D.Mo.2009) (interpreting MO.REV.

Each factor is relevant to the inquiry in this case insofar as it helps determine whether the disputed information was marked with indicia of secrecy at the time it was disclosed to Noonan. "The status of information claimed as a trade secret must be ascertained through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information as well as the nature of the defendant's misconduct." [48]

■■■ Powercorp identifies the subject of its alleged trade secret most clearly when it explains in its reply brief:

> The existence of the Woodward Controller is not Powercorp's trade secret. It is Powercorp's *custom program modifications and how to wire it into the system* that enabled it to replace the functions of several other components, get the gensets "talking to each other" and collect data which would be accessible via remote monitoring. This is Powercorp's use of its version of its highly modified Woodward Engine controller.

(Emphasis added.) At oral argument, Powercorp specified that one part of its secret involves leaving vacant the X4 and X5 terminals of the Woodward controller. The trade secret issue is also addressed in affidavits (some un-notarized) and depositions of some Powercorp employees, as well as Powercorp's responses to discovery. The question before us now is whether Powercorp exercised reasonable efforts to protect its allegedly unique methods of programming and wiring. This is ordinarily a question of fact, although, in some extreme cases, where the plaintiff could not have expected its information to remain secret, this may be resolved as a matter of law.[49]

Powercorp has produced some evidence about the value of its wiring and programming information to its business and to its competitors, the amount of effort or money expended in developing the programming and wiring information, and how difficult it would be for others to properly acquire or duplicate the same information and methods. Powercorp has asserted that it "developed [its] version of the Woodward GCP–31 (known as the GSS) controller over years of working with Woodward's predecessor, Leonhard–Reglenau," and that "nobody but Powercorp and Woodward knew what expanded functions it could do." These assertions are roughly supported by the affidavit of Gavin Bates, which alleges that during the development of the GSS controller, Powercorp and Woodward shared "the understanding that the features we, Powercorp, have paid for will not be incorporated in the version available to the general public."

By sending its confidentiality agreement to the Energy Authority, Powercorp made an effort to keep its information secret.[50] The fact that Zimmerman disclosed key information to Noonan in March, several months before the agreement was signed, does not necessarily mean that Powercorp acted unreasonably in its attempt to keep the information secret. Taking the evidence in the light most favorable to Powercorp, we assume that Powercorp believed that Noonan was aware of the information's sensitive nature by virtue of the parties' relationship and in light of Powercorp's sending the confidentiality agreement to the Energy Authority. In his affidavit, Zimmerman asserts that he believed Noonan "was asking for particulars on how the Powercorp system worked because he was evaluating our system for purchase." Although Zimmerman did not

STAT. 417.453)). These factors are also mentioned in RESTATEMENT (FIRST) OF TORTS § 757 (1939).

**48.** RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 cmt. d (1995).

**49.** *Fail–Safe LLC v. A.O. Smith Corp.*, 744 F.Supp.2d 831, 857 (E.D.Wis.2010) (citing *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725–26 (7th Cir.2003); *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179–80 (7th Cir.1991); *Tax Track Sys. Corp.*

*v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir.2007)).

**50.** *Id.* ("[I]n determining whether a claimant took reasonable steps to protect information as a trade secret, 'the presence or absence of confidentiality agreements or other means to convey confidentiality ... has a significant and predictable bearing on the outcome of the case.' ") (quoting *CMBB LLC v. Lockwood Mfg.*, 628 F.Supp.2d 881, 885 (N.D.Ill.2009)).

secure Noonan's signature on the agreement at the meeting, and there is no indication that Zimmerman mentioned confidentiality to Noonan before their discussion, it was reasonable for Zimmerman to respond openly to Noonan's questions, considering that the Energy Authority planned to evaluate the Powercorp system and had to follow strict protocols to maintain impartiality during the procurement process. The nature of the government-bidder relationship counsels in favor of Powercorp's position that the information was a trade secret.[51]

In light of this evidence, and despite some reservations,[52] we conclude under Alaska's generous summary judgment standard that there is a genuine issue of fact about the existence of a trade secret. There is sufficient evidence in the record to support Powercorp's position that it derived economic value from a method of programming or wiring a Woodward controller, which was not readily ascertainable by others.

However, we reject the argument that simply using a Woodward controller constitutes a trade secret. It is undisputed that some Woodward controllers, the GCP–30 series, are "sold and distributed throughout the world." The superior court properly summarized the evidence in the record when it stated that Woodward "has no problem with discussing ... how to use [these] devices and how to work with and modify them to accomplish the purpose that the consumer is looking for." And Woodward makes available at least some information about how to wire its controllers. Powercorp argues that certain key pieces of information—such as the idea to leave the X4 and X5 terminals vacant— were not generally available. The idea to leave certain terminals vacant and related programming methods may be relatively unknown. It is also reasonable to infer that any information known to Woodward as a result of its GSS licensing agreement with Powercorp was generally unknown. But it is unreasonable to infer from the record that

**51.** *See Wilkes v. Pioneer Am. Ins. Co. of Fort Worth*, 383 F.Supp. 1135, 1141 (D.S.C.1974) (identifying "a limited degree of confidentiality [that is] inherent in dealings with [government] officials"); *but see Eli Lilly & Co. v. Envtl. Prot. Agency*, 615 F.Supp. 811, 820 (D.C.Ind.1985) (concluding that parties who submitted trade secret pesticide data to the Environmental Protection Agency prior to the enactment of a law that guaranteed confidentiality could not expect such confidentiality).

**52.** There are two strong arguments that counsel against the conclusion Powercorp has produced sufficient evidence of reasonable efforts to maintain secrecy. First, there is no indication that Powercorp did anything between May 2004 and September 2004 to remind the Energy Authority of the secret nature of Powercorp's information. May 2004 is when the Energy Authority released the bid specifications for REG 04–230. According to Powercorp's own theory of the case, the release of these bid specifications should have alerted Powercorp to the possibility that secret information had been disclosed. But there is no indication that Powercorp contacted the Energy Authority to limit the spread of this information.

Second, Powercorp has left significant gaps in its development of the evidence in this case. Powercorp has not put into the record evidence of its general information-security practices, including information about the number of employees who have access to the Woodward programming/wiring information, whether that information is available to a limited category of employees, or any regular protocols—

such as confidentiality agreements, passwords, and locked premises—that might help to limit access to this information. Evidence of these internal information-security practices commonly appears in courts' evaluations of trade secret claims. *See, e.g., Cerner Corp.*, 667 F.Supp.2d at 1077–78 ("Visicu required [non-disclosure agreements] and labeled the documents as confidential and proprietary information. Additionally, while Visicu made sales presentations for its eICU solution and attended trade shows, Visicu did not make handouts available absent a [non-disclosure agreement]."); *Crane Helicopter Servs., Inc. v. United States*, 56 Fed.Cl. 313, 325–26 (Fed.Cl.2003) ("The list of precautions taken by Bell to protect its trade secret information, as described in Mr. McCrary's unrefuted affidavit, is sufficient to meet this requirement."); *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 650 (5th Cir.1997) ("[D]uring his ownership of the mold Reingold maintained exclusive control and did not disclose it to or allow its use by anyone prior to leasing it to Swiftships."). This information relates directly to the first three factors identified above. Although the parties seem to agree that the GSS controller was manufactured under license from Woodward, Powercorp has not produced the licensing agreement or other evidence of Woodward's specific obligations under the agreement that would support the limited availability of this information. Powercorp is not required to produce evidence of all six factors to survive summary judgment, but the gaps in its evidence are apparent.

*the idea to use a Woodward controller* was not ascertainable by others. Insofar as Powercorp alleges that its trade secret covers the general use of, or access to, a Woodward controller, its trade-secret claim fails.

## 2. Misappropriation

For Powercorp's claim to survive, Powercorp must also produce evidence of misappropriation.[53] The Trade Secret Act defines "misappropriation" as follows:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who

(i) used improper means to acquire knowledge of the trade secret; or

(ii) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it or who owed a duty to the person seeking relief to maintain its secrecy or limit its use, or was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.] [54]

The statute provides that " 'improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." [55]

■■■ Powercorp has asserted that the bid specification for ITB REG 04–230 disclosed to Controlled Power key information that Noonan had learned about the Woodward component and how to connect it. But there is no indication in the record that this bid specification contained secret information. The bid specification required use of a Woodward controller. Even if Noonan were responsible for releasing this information and the bid specification provided Controlled Power with the idea to use the GCP–31, the communication of *that* idea does not violate the trade secrets statute.

Powercorp's main argument under the "misappropriation" prong seems to be that it is inconceivable that Controlled Power would have developed remote monitoring capability without improper access to Powercorp's secret information, which it must have obtained through Noonan. At oral argument before the superior court, Powercorp emphasized that it took years to develop its unique wiring and programming method for use with the Woodward GSS controller. Powercorp contrasted this with the relatively short period in which Controlled Power learned to wire and program a GCP controller for the RPSU contract. Controlled Power admits that its engineers figured out how to wire a Woodward GCP controller in response to the Energy Authority's specification of that device for the REG 04–230 contract. But the fact that Controlled Power was able to use a Woodward controller does not compel the conclusion that Noonan made an improper disclosure to Controlled Power in this case. The superior court properly declined to make this inference.[56]

Powercorp has not presented sufficient evidence to support the inference that Noonan acquired information through "improper means" or that Noonan "knew or should have

**53.** *See Utah Med. Prods., Inc. v. Clinical Innovations Assocs.*, 79 F.Supp.2d 1290, 1311 (D.Utah 1999) (internal citations omitted).

**54.** AS 45.50.940(2).

**55.** AS 45.50.940(1).

**56.** *See Kewanee Oil v. Bicron Corp.*, 416 U.S. 470, 476, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) ("A trade secret law ... does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture."); *see also Burns v. Erving*, 810 F.Supp.2d 1167, 1172 (D.Nev. 2011) (in rejecting plaintiffs' misappropriation of ideas claim, court emphasized plaintiffs offered no evidence, other than their own disbelief, that defendant took or used their idea in any way rather than creating the relevant marketing campaign on his own).

known" that he improperly obtained a secret. According to Powercorp's own allegations, it freely disclosed information to Noonan at a March 2003 meeting. Thus, there is no indication that Noonan acquired the information by improper means. Absent evidence that Noonan acquired the information by improper means, Powercorp must provide evidence to support the inference that Noonan used or disclosed information that he either knew or should have known was secret. The closest evidence to which Powercorp might point is the confidentiality agreement that was sent to the Energy Authority in January 2003. But it is not clear from the record that Noonan had actually seen this agreement. Nor is there any evidence that Zimmerman put Noonan on notice that they would discuss secret Powercorp methods. And there is no evidence that Noonan disclosed wiring or programming information to Controlled Power or any other party. Because Powercorp has not supported its allegation that Noonan engaged in misappropriation, we affirm the superior court's decision to dismiss Count IV.

### G. It Was Not Error To Dismiss Count V—Powercorp's Claim That Controlled Power Misappropriated A Trade Secret.

Count V of the complaint alleges that Controlled Power misappropriated a Powercorp trade secret and that Controlled Power was unjustly enriched as a result. For this claim to survive summary judgment, Powercorp must produce either evidence of "improper acquisition" under AS 45.50.940(2)(B)(i) or evidence that Controlled Power "knew or had reason to know" that it had received and used a trade secret under AS 45.50.940(2). This evidence is not before us. There is no indication that Controlled Power adopted Powercorp's unique wiring or programming method or used this information in any way. Powercorp has not produced evidence that would rebut the assertions of Controlled Power employees that they were able to wire the GCP controller based on information they obtained from Woodward. While Woodward's willingness to disclose some information about its GCP

controllers does not undercut the conclusion that Powercorp's method of wiring and programming constituted a trade secret, the availability of this information is at odds with Powercorp's argument that Controlled Power could not have devised a legitimate wiring method within several months. It is not reasonable to infer that Controlled Power obtained Powercorp's secret wiring and programming information through unlawful misappropriation. We affirm the superior court's decision to dismiss Count V.

### H. It Was Not Error To Dismiss Count VIII—Powercorp's Claim That Controlled Power Illegally Colluded With Gray And Noonan.

Count VIII alleges that Controlled Power colluded with Noonan and others to increase costs and obstacles to other prospective bidders. Powercorp alleged that, as a result of this collusion, the invitation to bid included "a short delivery requirement" with which only Controlled Power could comply and that Controlled Power was able to comply with this requirement only as a result of its contacts with defendants Noonan and Gray. The complaint also alleges that only Controlled Power "was able to reduce the performance bond requirement."

Powercorp mentions Count VIII only once in its opening brief. Count VIII is not clearly addressed in Powercorp's statement of the issues or statement of points on appeal. And Powercorp's brief does not directly address the short delivery or performance-bond requirements mentioned in this part of the complaint. We are unable to discern, and thus unable to address, an argument here. We conclude that Powercorp has waived this argument.[57]

Powercorp also fails to explain how alleged deficiencies in the bid specification could result in any liability for Controlled Power. If this is a claim of tortious interference, it fails for the reasons discussed in Part IV.E. To the extent that the allegations in Count VIII

---

**57.** *See supra* note 40.

advance a different argument, we consider such argument waived.[58]

## I. No Procedural Ruling Of The Superior Court's Constitutes Abuse Of Discretion.

Powercorp also raises the following points on appeal: (1) The superior court erred in precluding Powercorp from deposing Energy Authority employees Lenny Landis and Bob Havemeister on Powercorp's trade secret claim against Noonan or any other issue; (2) the superior court erred in granting Controlled Power summary judgment on the grounds of failure to identify a trade secret when Powercorp had moved for a protective order to prevent further unauthorized disclosure of a trade secret; and (3) the superior court erred in denying Powercorp's motion to compel Controlled Power to produce correspondence between it and the other defendants. Each of these arguments fails.

 As to the first argument, Alaska Civil Rule 26(b)(1) provides:

Parties may obtain discovery regarding any matter, not privileged which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party.... The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

This standard authorizes the parties to seek substantial amounts of information, but it requires parties to act reasonably. Whether information is "reasonably calculated to lead to the discovery of admissible evidence" depends on the circumstances of the case, and this question is entrusted to the discretion of the trial judge:[59]

Under Civil Rule 26(b)(2), the superior court may limit the use of discovery methods such as depositions if it determines that the burden or expense of the proposed discovery outweighs its likely benefit, tak-ing into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.[60]

The underlying facts of this case were in dispute as early as June 2004 when Powercorp protested the REG 04–230 invitation to bid. Before the complaint was filed in this case, Landis, Havemeister, and Noonan had testified in administrative proceedings concerning Powercorp's REG 04–230 and REG 05–670 bid protests. The complaint in this case was filed in August 2006. The first motion seeking to dismiss claims was filed in February 2008. Motions seeking to dismiss the other claims followed.

 Controlled Power filed its motion for summary judgment in March 2008. In November, following an extension, Powercorp opposed the motion for summary judgment and sought a protective order. Controlled Power filed its reply in December, making the motion ripe for resolution by the superior court, which held oral argument in February 2009. In the 11 months before the court ruled on the motion for summary judgment, Powercorp was engaged in a series of discovery disputes with Controlled Power. At the February hearing, Powercorp argued that it should not be required to go to Controlled Power headquarters to examine voluminous discovery documents, which were the subject of earlier orders to compel. At the hearing, the court granted Controlled Power's motion for summary judgment and rejected, as moot, Powercorp's argument about the voluminous discovery. The court later explained that asking Powercorp to bear the costs of traveling to Controlled Power's headquarters was reasonable. This discovery ruling was not an abuse of discretion.

Although it dismissed the claims against Controlled Power, the court granted Powercorp's protective order at the February hearing. Granting Controlled Power's motion for

**58.** *Id.*

**59.** *Lee v. State*, 141 P.3d 342, 347 (Alaska 2006).

**60.** *Prentzel v. State, Dep't of Pub. Safety*, 169 P.3d 573, 594 (Alaska 2007) (citing Alaska R. Civ. P. 26(b)(2)(A)(iii)).

summary judgment on the same day as the protective order was not an abuse of discretion in light of that fact that the motion for a protective order was filed well after the issues addressed on summary judgment had become evident.

After the February 2009 hearing, the only remaining claim alleged trade-secret misappropriation by Noonan. Then, between March 19 and 25, 2009, Powercorp apparently contacted the Energy Authority about deposing Noonan, Havemeister, and Landis. On March 26, the Energy Authority asked Powercorp to explain the relevance of the Havemeister and Landis depositions to the remaining claim. On the same day, Powercorp provided barely two weeks notice that it planned to depose Havemeister and Landis on April 7, 2009. Asserting that Powercorp did not respond to its request for an explanation, the Energy Authority then sought a protective order to prevent the Landis and Havemeister depositions from going forward and made a request for expedited consideration.

On April 1, 2009, the court issued an order, which stated:

> The Court ... does not currently see a reason for the plaintiff, Powercorp's scheduling such short fused depositions. If Powercorp has compelling reasons for conducting the depositions of the [Energy Authority] employees on the proposed schedule, it can state those reasons and provide its responses to the underlying motion by the close of business Friday, April 3, 2009. If there is no need to conduct the depositions on April 7, 2009, the plaintiff can respond to the underlying motion in due course.

The parties continued to exchange correspondence on the issue of Landis's deposition in late August 2009, when the Energy Authority stated that Landis would be available for a deposition in September. In the meantime, Powercorp's opposition to Noonan's motion for summary judgment had come due. The superior court had granted an extension on the opposition in April. But it denied a motion to extend the deadline further under Rule 56(f). Powercorp argued that by denying the second extension, the

court "effectively granted the motion to quash the depositions." Powercorp claims that without Landis's deposition, Noonan would "have his scapegoat"; by this, Powercorp seems to mean that Noonan could blame Landis for any errors in the procurement process. The final claim, alleging trade secret misappropriation against Noonan, was dismissed at a hearing in September 2009, almost three years after the complaint was filed. The court's decision to dismiss this claim—after three years of litigation and several extensions—was not premature, and it was not an abuse of discretion.

## V. CONCLUSION

For the reasons discussed above, we AFFIRM the decision of the superior court.

CHRISTEN and STOWERS, Justices, not participating.

WINFREE, Justice, dissenting in part.

WINFREE, Justice, dissenting in part.

I agree with the court's conclusion to reverse the trial court's summary judgment ruling to the extent it was based on the doctrines of collateral estoppel and res judicata. But I am unable to agree with the court's conclusion to affirm at least a portion of that ruling on the alternative ground of qualified immunity for Ron Miller. Official immunity was never raised in the summary judgment motion practice in the trial court, no party had reason to submit evidence on Miller's bad faith during that motion practice, the trial court did not consider or rule on qualified immunity for Miller in that motion practice, and there was no reason to appeal from a qualified immunity decision not made by the trial court. I therefore find procedural unfairness in the court's conclusion that Miller's alleged bad faith is "unsupported by the record [and] waived due to inadequate briefing." I would remand the immunity question for resolution by the trial court after the parties have had a fair opportunity to make an evidentiary record on the question.

I also would reverse the trial court's summary judgment ruling on Powercorp Alaska, LLC's trade secret misappropriation claims

against the Alaska Energy Authority defendants and Controlled Power, Inc. In my view there are a number of genuine issues of material fact barring summary judgment on these claims.[1] This would obviate the need to decide Powercorp's assertion of procedural errors in connection with the dismissal of those claims.

I otherwise agree with today's decision.

---

1. I take no position on the court's statement of the relevant law for the trade secret misappropriation claims; *cf.* Alaska Appellate Rule 106 (stating that decision on issue by two of three justices does not create binding precedent).